**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-2102**

CLAYLAND FARM ENTERPRISES, LLC,

Plaintiff - Appellant,

v.

TALBOT COUNTY, MARYLAND; TALBOT COUNTY PLANNING & ZONING COMMISSION; TALBOT COUNTY DEPARTMENT OF PUBLIC WORKS ADVISORY BOARD; THOMAS HUGHES, in his individual and official capacity; MICHAEL SULLIVAN, in his individual and official capacity; JOHN WOLFE, in his individual and official capacity; JACK FISCHER, in his individual and official capacity,

Defendants - Appellees.

and

MARYLAND DEPARTMENT OF PLANNING,

Defendant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. George L. Russell, III, District Judge. (1:14-cv-03412-GLR)

Argued: October 27, 2020                          Decided: February 8, 2021

Before NIEMEYER, WYNN, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Floyd wrote the opinion in which Judge Niemeyer and Judge Wynn joined.

_____

**ARGUED:** Mark F. Gabler, RICH & HENDERSON, PC, Annapolis, Maryland, for Appellant. Victoria M. Shearer, ECCLESTON & WOLF, PC, Hanover, Maryland, for Appellee. **ON BRIEF:** Warren K. Rich, Peter C. Hershey, RICH & HENDERSON, P.C., Annapolis, Maryland, for Appellant.

_____

FLOYD, Circuit Judge:

This dispute arises out of three local zoning ordinances designed to limit new residential development pending the completion of a comprehensive rezoning plan. Appellant Clayland Farm Enterprises, LLC (Clayland) appeals the district court's ruling that the ordinances are constitutional under the Takings Clause and the Due Process Clause and that Clayland's equitable claims are moot. For the following reasons, we affirm.

I.

A.

Clayland owns approximately 106 acres of waterfront property adjacent to the Chesapeake Bay in the Village of Royal Oak in Talbot County, Maryland (the "Property"). The Property consists of eight plots of 88.548 acres, 3.905 acres, 3.243 acres, 2.371 acres, 2.271 acres, 2.019 acres, 2.008 acres, and 2.005 acres, respectively. Siblings John Camper III and Jeanne Bryan (the "Camper siblings") own Clayland in equal shares. The Camper family first acquired the Property in 1969; the Camper siblings inherited the Property and formed Clayland after their mother died in 2002.

Since 1969, the Camper family has used the Property for farming and has leased portions for residential use. Clayland earns approximately $5,000 to $10,000 per year through sharecropping. Clayland leases three residential properties, which generated monthly rents of $1,050 to $1,340 between 2006 and 2018. Clayland also leases an eight-acre plant nursery to a relative for $1 per year. In 1991, Talbot County granted the Camper family approval to build a six-lot subdivision called "Darby Farm." Neither the Camper

3

family nor Clayland ever moved forward with developing the approved subdivision.

Several state and local regulations inform this litigation. Maryland's Chesapeake and Atlantic Coastal Bays Critical Area Protection Program (CAPP) regulates land use within the environmentally fragile area designated as the Chesapeake Bay Critical Area. *See* Md. Code Ann., Nat Res. § 8-1801 *et seq.* (West 2000). Local jurisdictions have primary responsibility for implementing protections consistent with CAPP, including developing zoning maps. Most of the Property—all but approximately five acres—is located within the Chesapeake Bay Critical Area.

Maryland law also requires each local jurisdiction to create a comprehensive plan for its growth, land use, and development. A comprehensive plan is not itself a code of regulations but rather a set of planning goals to be implemented through zoning ordinances and development regulations. In 2011, when the relevant conduct at issue in this litigation began, Maryland law required local jurisdictions to review and, if necessary, revise their comprehensive plan at least every six years. The Talbot County Comprehensive Plan (2005 Comprehensive Plan) was the operative plan at the start of this litigation. The 2005 Comprehensive Plan zoned the Property as a "Village Center" (VC), defined as an area of "low or moderate intensity residential communities" and "the preferred location for single and multi-family residential development." J.A. 133. At the time, VC zones were permitted four units per acre of residential development. Under the state law requiring review every six years, Talbot County intended to review the 2005 Comprehensive Plan in 2011.

The Talbot County Comprehensive Water and Sewer Plan (CWSP) is the guiding

4

document for extension of sewer service in the County. The Property was and still is designated as an S-1 sewer service area. S-1 sewer service areas are "'served or to be served' by a system of sanitary sewer[s] connected to a treatment plant." J.A. 133 (quoting Md. Code. Regs. 26.03.01.01(S) (2020)). A connector sewer line has existed adjacent to the Property since the 1980s, and Clayland connected the existing structures on the Property to this sewer line in 2013.

With its VC and S-1 zoning designations, Clayland had the ability to develop the Property for residential housing. However, Clayland never took any steps to begin development, further subdivide the Property, or request sewer allocation for any future development. Indeed, the Camper siblings previously agreed in 2002 to continue using the Property as a farm for ten years in exchange for reduced federal estate tax liability.[1]

On March 22, 2011, Talbot County adopted Resolution 180. Resolution 180 imposed a nine-month moratorium on processing new subdivision applications in the VC zones of six villages within the county, including the Village of Royal Oak. Talbot County enacted Resolution 180 "to allow sufficient time for the County" to "make the [CWSP] consistent with the comprehensive land-use plan." J.A. 207. Resolution 180 explained "that many of the existing [VC zones] have problems with failing septic systems" and that

---

[1] The Camper siblings elected to value the Property under Internal Revenue Service (IRS) Special Use Valuation 2032A for purposes of estate tax assessment. *See* 26 U.S.C. § 2032A(b)(1)(A)(i)–(ii), (b)(1)(C)(i)–(ii), (c)(1)(A)–(B). As a result, the IRS placed a $500,000 tax lien on the Property in exchange for the Camper siblings' agreement to continue the agricultural use of the Property for ten years. The IRS released the tax lien in January 2012.

"[Talbot] County requires time to ensure that appropriate study, suitable proposals, and desired public input is obtained before considering amendments to the County zoning and subdivision ordinance and/or zoning maps." J.A. 206. On January 10, 2012, Talbot County extended Resolution 180 for an additional seventy days.

On February 28, 2012, as the end of Resolution 180's moratorium neared, Talbot County adopted Bill No. 1214, which applied to all VC zones. Bill No. 1214 reduced the permissible density of residential properties from four units per acre to one unit per two acres and prohibited subdividing any existing parcel into more than one additional lot. Talbot County originally drafted Bill No. 1214 to expire three years after enactment but subsequently amended it to two years.

In 2012, the Maryland General Assembly passed the Sustainable Growth and Agricultural Preservation Act (the "Septics Law"). *See* Md. Code Ann., Land Use § 1-508 (West 2012). The Septics Law sought to minimize the environmental impact of large subdivisions and their septic systems. It established a four-tier map system and required local jurisdictions to adopt corollary tier maps. Pursuant to this requirement, on December 11, 2012, Talbot County adopted Bill No. 1229. Bill No. 1229 established seven tier classifications related to "the type of subdivision and the kind of wastewater treatment system planned for each subdivision type." J.A. 134.

Three of the seven tiers are relevant here. Tier I designated "[a]reas that are now served [by sewerage systems] or where public sewerage systems are available and that are mapped by the County Comprehensive Plan as a designated growth area." J.A. 230. Tier III-B designated "[r]ural villages or existing communities or neighborhoods designated as

6

water quality strategy areas, which have or are planned to have public sewerage systems to address water quality and that are planned for infill and limited peripheral development only." J.A. 231. Tier IV designated "[a]reas that are not planned for public sewerage systems in the County Comprehensive Plan or [CWSP] that are either planned or zoned for and/or dominated by agricultural, resource protection, preservation, and/or conservation areas." *Id.*

Talbot County designated one hundred acres of the Property as Tier IV and the remaining six acres as Tier III-B. However, on December 4, 2012—prior to official adoption of Bill No. 1229—the Maryland Department of Planning (MDP) sent informal comments to Talbot County regarding the tier map designations. MDP advised that "[s]ome areas that are shown as Tier III should be Tier I because they have existing sewer [service]." J.A. 243. The Property was one such area with existing sewer service that was partially designated as Tier III. Talbot County did not change the Property's tier designations pursuant to MDP's comments. Nevertheless, on February 1, 2013, MDP formally advised that the tier map "satisfie[d] the criteria for designation of growth tiers" and MDP had "no comments." J.A. 750.

Meanwhile, effective October 1, 2013, Maryland amended state law governing when local jurisdictions must review their comprehensive plans. Instead of requiring review every six years, the new law required review only every ten years. *See* Md. Code Ann., Land Use § 1-416(a) (West 2013). Talbot County thus altered its target date for revising the 2005 Comprehensive Plan from 2011 to 2015.

On February 25, 2014, Talbot County adopted Bill No. 1257. Bill No. 1257

extended Bill No. 1214's restrictions on VC zones (including the decreased density of residential units and the limitations on new subdivisions) until Talbot County "adopt[ed] . . . comprehensive rezoning and land use regulations regarding density . . . pursuant to the County's comprehensive plan." J.A. 253.

On June 7, 2016, Talbot County enacted its new comprehensive plan (the "2016 Comprehensive Plan"). The 2016 Comprehensive Plan incorporated the tier map established by Bill No. 1229. To effectuate the goals of the 2016 Comprehensive Plan, Talbot County adopted a new comprehensive rezoning plan (the "2018 Comprehensive Rezoning"), which took effect on November 10, 2018. The 2018 Comprehensive Rezoning rezoned the Property from a VC zone to a Resource Conservation (RC) zone. RC zones allow residential development at a density of only one unit per twenty acres. The 2018 Comprehensive Rezoning also simultaneously caused Bill No. 1257—the extension of Bill No. 1214's density and subdivision restrictions—to expire.

## B.

On September 16, 2014, Clayland filed a complaint against Talbot County and various instrumentalities and employees of Talbot County (collectively, the "County") alleging that Bill Nos. 1214 and 1257 constitute an unconstitutional taking in violation of the Fourteenth Amendment; Bill Nos. 1214 and 1257 constitute a deprivation of procedural due process in violation of the Fourteenth Amendment; Bill Nos. 1214, 1257, and 1229 constitute a deprivation of substantive due process in violation of the Fourteenth Amendment; and the County engaged in a civil conspiracy to violate Clayland's Fourteenth

8

Amendment due process rights. The complaint also sought a declaratory judgment that Bill Nos. 1214, 1257, and 1229 are invalid under state law and injunctive relief enjoining Bill Nos. 1214, 1257, and 1229.

On April 30, 2015, the district court granted the County's motion to dismiss on ripeness grounds. This Court reversed on appeal. *Clayland Farm Enters., LLC v. Talbot County*, 672 F. App'x 240 (4th Cir. 2016). While that appeal was pending, Clayland filed a second complaint that was largely duplicative of the original complaint.[2] The district court consolidated the two complaints on May 5, 2017.

On August 29, 2019, the district court granted the County's motion for summary judgment. The court entered judgment in favor of the County as to Clayland's constitutional claims. The court also declared Clayland's equitable claims moot and dismissed them for lack of subject-matter jurisdiction. Clayland now timely appeals the district court's dismissal of the takings claim, the substantive due process claim, and the equitable claims. Clayland does not appeal the dismissal of its procedural due process claim or its civil conspiracy claim.

---

[2] The second complaint alleged that Bill Nos. 1214 and 1257 constitute a taking in violation of the Fifth Amendment, the Fourteenth Amendment, article 24 of the Maryland Declaration of Rights, and article III, section 40 of the Maryland Constitution. The second complaint also sought a declaratory judgment that Bill Nos. 1214 and 1257 are invalid under state law and the Fourteenth Amendment; a declaratory judgment that Bill No. 1229 is invalid under state law; and injunctive relief enjoining Bill Nos. 1214, 1257, and 1229.

II.

The district court's grant of summary judgment is reviewed de novo. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). The court's dismissal of Clayland's equitable claims for lack of subject-matter jurisdiction also is reviewed de novo. *See Covenant Media of S.C., LLC v. City of North Charleston*, 493 F.3d 421, 428 (4th Cir. 2007).

A.

We first consider whether Bill Nos. 1214 and 1257 constitute a taking. The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The Supreme Court recognized in *Penn Central Transportation Co. v. City of New York* that a regulation can be so burdensome as to become a taking. 438 U.S. 104, 124 (1978). To determine whether Bill Nos. 1214 and 1257 exceed that threshold, *Penn Central* requires this Court to balance "'a complex of factors,' including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)). The first two factors—economic effects and investment-backed expectations—are "[p]rimary among those factors." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39 (2005).

10

Maryland law also recognizes regulatory takings. *See Neifert v. Dep't of Env't*, 910 A.2d 1100, 1119 (Md. 2006). Analysis under article III, section 40 of the Maryland Constitution utilizes the same *Penn Central* analysis. *See id.*

Clayland's appellate briefing asserts that Bill Nos. 1214, 1257, and 1229 constitute a facial regulatory taking under both federal and state law. Bill No. 1214 temporarily reduced the permissible density of VC-zoned properties from four units per acre to one unit per two acres and prohibited new subdivision of any existing VC-zoned parcel into more than one additional lot. Bill No. 1257 extended these restrictions until the adoption of a new comprehensive plan. Bill No. 1229 separately implemented a tier map. Preliminarily, Clayland's underlying complaints allege only that Bill Nos. 1214 and 1257 constitute a taking. The district court's takings analysis focuses expressly and exclusively on Bill Nos. 1214 and 1257. Clayland may not argue that Bill No. 1229 constitutes a taking for the first time on appeal. *See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416 n.2 (4th Cir. 2000) (refusing to consider argument raised for the first time on appeal). As such, we cabin our takings analysis to Bills. No. 1214 and 1257.

1.

First, the economic-effects factor weighs in favor of the County. The Property's diminution in value is insufficient to establish a regulatory taking. Before the County enacted Bill No. 1214, the Property was valued at $3,250,000; after the County enacted Bill No. 1214, the Property was valued at $1,950,000. Accordingly, after the County enacted Bill No. 1214, the Property decreased in value by $1,300,000, or approximately 40

11

percent. And yet this Court has found that a hypothetical 83 percent diminution in value was insufficient to establish a regulatory taking. *See Pulte Home Corp. v. Montgomery County*, 909 F.3d 685, 696 (4th Cir. 2018). This Court has also noted that other circuits have found no regulatory taking when presented with diminutions in value of 75 percent and 92.5 percent. *See Henry v. Jefferson Cnty. Comm'n*, 637 F.3d 269, 277 (4th Cir. 2011) (citing *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 456 & n.6 (6th Cir. 2009); *Iowa Coal Mining Co. v. Monroe County*, 257 F.3d 846, 853 (8th Cir. 2001)).

Further, the Property retained valuable, expressly permitted uses under Bill Nos. 1214 and 1257. "A regulation is not a taking merely because it 'prohibit[s] the most beneficial use of the property . . . .'" *Quinn v. Bd. of Cnty. Comm'rs*, 862 F.3d 433, 442 (4th Cir. 2017) (alteration in original) (quoting *Penn Cent.*, 438 U.S. at 125); *see also Henry*, 637 F.3d at 276 (finding no regulatory taking in part because "property zoned rural-agricultural under the ordinance retained a number of valuable, expressly permitted uses"). Under Bill Nos. 1214 and 1257, Clayland could subdivide any existing parcel into one additional lot, develop at one unit per two acres, or proceed with the approved six-lot Darby Farm subdivision. The first factor, therefore, weighs in favor of the County.

2.

The second factor—reasonable investment-backed expectations—weighs heavily in the County's favor. A takings claim must be premised on a preexisting property right. *See Quinn*, 862 F.3d at 439; *Henry*, 637 F.3d at 277. Property rights are "determined by reference to 'existing rules or understandings that stem from an independent source such

12

as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. Of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

Clayland had no affected preexisting development rights in relation to the Property. Under Maryland law:

> in order to obtain a "vested right" in the existing zoning use which will be constitutionally protected against a subsequent change in the zoning ordinance prohibiting or limiting that use, the owner must (1) obtain a permit or occupancy certificate where required by the applicable ordinance and (2) must proceed under that permit or certificate to exercise it on the land involved so that the neighborhood may be advised that the land is being devoted to that use.

*A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 370–71 (4th Cir. 2008) (quoting *Powell v. Calvert County*, 795 A.2d 96, 102 (Md. 2002)).[3] The parties agree that Clayland retains the right to develop the six-lot Darby Farms subdivision for which the Camper family received approval in 1991. But Clayland never obtained a permit, began construction, or took *any* action on any other development to which it now claims

---

[3] Many states have similar statutes or common law doctrines regarding vested zoning and development rights. *See, e.g.*, *Berry v. Volunteers of Am., Inc.*, 182 So. 3d 1252, 1262 (La. Ct. App. 2015) ("A property owner holds property subject to the police power of the Parish, and does not have a vested property interest in the existing zoning of property." (citing *Glickman v. Parish of Jefferson*, 224 So. 2d 141, 145 (La. Ct. App. 1969)); *Furey v. City of Sacramento*, 592 F. Supp. 463, 469 (E.D. Cal. 1984) ("California law on the question has long been clear: no property owner has a vested right in a particular type of zoning, existing or anticipated."), *aff'd*, 780 F.2d 1448 (9th Cir. 1986), *abrogated on other grounds by Schnuck v. City of Santa Monica*, 935 F.2d 171, 173 (9th Cir. 1991); *W.R. Grace & Co.-Conn. v. Cambridge City Council*, 779 N.E.2d 141, 155 (Mass. App. Ct. 2002) ("A property owner cannot reasonably rely on an assumption that zoning will forever remain the same, and that the government will refrain indefinitely from valid changes in zoning . . . . [A] developer with designs on improving its property consistent with an existing zoning framework had best get its shovel into the ground.").

entitlement. Clayland could not reasonably expect that its zoning designation would remain unchanged in perpetuity.

Notably, the County was tasked under state law with reviewing and possibly revising its comprehensive plan every six years (now, every ten years). The County had initially planned to propose a new comprehensive plan in 2011. The County postponed its target date to 2015 only after Maryland changed the state-law requirement in 2013 to require review every ten years rather than every six years. Clayland was obligated to continue its farming operations on the Property until 2012 in exchange for its reduced federal estate tax liability. Thus, prior to the 2013 change in state law, the County had planned to review and revise its 2005 Comprehensive Plan before Clayland even had the opportunity to begin development.

Accordingly, the second factor weighs strongly in favor of the County.

3.

In considering the third factor, the character of the governmental action, "[r]egulatory takings doctrine seeks to 'identify regulatory actions that are functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner from his domain.'" *Henry*, 637 F.3d at 277 (4th Cir. 2011) (quoting *Lingle*, 544 U.S. at 539). "Interference with property is less likely to be considered a taking when it 'arises from some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Quinn*, 862 F.3d at 443 (quoting *Penn Cent.*, 438 U.S. at 124). "Regulations that control development based 'on density

14

and other traditional zoning concerns' are the paradigm of this type of public program." *Id.* (quoting *Henry*, 637 F.3d at 277) (explaining that "[l]ocal governments need to be able to control the density of development to prevent the overburdening of public services, environmental damage, and other harms").

The Supreme Court has expressly approved of the use of moratoria to regulate land use, noting that they "are used widely among land-use planners to preserve the status quo while formulating a more permanent development strategy" and "are an essential tool of successful development." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 337–38 (2002). "[T]he interest in protecting the decisional process is even stronger when an agency is developing a regional plan than when it is considering a permit for a single parcel." *Id.* at 340. However, "the duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim." *Id*. at 342. There is no bright-line rule for how long a restriction may remain in effect before it implicates constitutional rights. *See id.* ("Formulating a general rule of this kind is a suitable task for state legislatures."). Rather, whether a duration is reasonable depends on the context. *See, e.g.*, *Phillips v. Borough of Keyport*, 107 F.3d 164, 181 (3d Cir. 1997) (observing that any delay resulting from "a moratorium for the purpose of allowing the municipality a reasonable opportunity to consider whether the secondary effects of adult entertainment uses required additional zoning regulation . . . could not constitute a substantive due process violation").

Here, Bill Nos. 1214 and 1257 were "paradigm[atic]" public-benefit regulations. *Quinn*, 862 F.3d at 443 (quoting *Henry*, 637 F.3d at 277). The County enacted them "to

15

control the density of development to prevent the overburdening of public services, environmental damage, and other harms." *Id*. True, they imposed development restrictions for a lengthy total of six years. As the district court noted, "six years is a long period of time to forestall development in the lead-up to a zoning change." J.A. 154. But as the County explains, the exacting rezoning process involved ensuring compliance with Maryland state law, communicating across several County bodies, revising its plan according to public comment and public hearings, and dealing with public opposition (including the instant litigation). Once the County adopted the 2016 Comprehensive Plan, it then had to contract with an outside company to enact the 2018 Comprehensive Rezoning consistent with the new plan. The County also asserts that the change in Maryland law— which required a review of the County's comprehensive plan every ten years rather than every six years—derailed its rezoning process, though it is unclear why an *extension* of time would be detrimental.

Although the County provides legitimate reasons for the delay, the district court was correct to express concern over the length of that delay. The third factor weighs slightly in favor of Clayland.

\*     \*     \*

Despite the length of the delay, the balance of the *Penn Central* test ultimately favors the County. Bill Nos. 1214 and 1257 were public-benefit regulations that did not deprive Clayland of all development potential and—most significantly, and perhaps even

16

decisively—did not divest Clayland of any vested rights. Accordingly, Bill Nos. 1214 and 1257 did not constitute a regulatory taking.

B.

Next, we consider Clayland's substantive due process claim. To establish a substantive due process violation, a plaintiff must demonstrate "(1) that [he] had property or a property interest; (2) that the state deprived [him] of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *Quinn*, 862 F.3d at 443 (alterations in original) (quoting *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 827 (4th Cir. 1995)). This is a particularly high hurdle in the zoning context: "it must be clear that the state's action 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health . . . [or] public safety.'" *MLC Auto., LLC v. Town of Southern Pines*, 532 F.3d 269, 281 (4th Cir. 2008) (quoting *Nectow v. City of Cambridge*, 277 U.S. 183, 187–88 (1928)).

Clayland argues that Bill Nos. 1214, 1257, and 1229 violated its substantive due process rights. We disagree. First, Clayland cannot establish that the Bills limiting development—Bill Nos. 1214 and 1257—deprived it of a property interest because Clayland lacked any relevant, cognizable property interest. As discussed, Clayland had no affected development rights under Maryland law. The inquiry ends there. Regardless, Bill Nos. 1214 and 1257 were also reasonable and substantially related to public health and safety. *See id.* at 281. The County enacted those Bills to maintain the status quo leading

17

up to the new comprehensive plan and concomitant rezoning, which in turn were intended to bring the CWSP and 2005 Comprehensive Plan into conformity with each other, given the existing sewer problems and the need to protect the ecological area.

Nor did the tier map pursuant to Bill No. 1229 constitute a substantive due process violation. Clayland argues that the tier map designations usurped its right to sewer service. Both the Fourth Circuit in *Quinn* and the Maryland Court of Appeals in *Neifert* rejected the notion that landowners have such a right. *See Quinn*, 862 F.3d at 439–40 (finding no right to "access to a sewer system" when the municipality did not extend sewer service to the plaintiff's property); *Neifert*, 910 A.2d at 1122 (same). Clayland argues that *Quinn* and *Neifert* are not binding here because they involve different underlying facts. While the facts may differ, the operative point remains the same: there is no constitutional right to sewer service.

Even assuming that the tier map designations deprived Clayland of a cognizable property interest, the tier map was rationally related to the County's zoning powers. The County enacted Bill No. 1229 pursuant to and in conformity with Maryland's Septics Law. Although Clayland argues that its individual designations were incorrect, the County provided a reasonable explanation for the alleged inconsistency. The County explained that "[n]one of the definitions devised by the [Maryland] General Assembly in the Septics Law applied exactly" to the Property. J.A. 582. Although the Property had limited sewer service, it was not mapped as a "designated growth area" as required for a Tier I designation. The Property's Tier IV designation, therefore, best reflected both the Septics

Law's framework and the anticipated future 2016 Comprehensive Plan. Other parcels were similarly impacted.

Accordingly, Bill Nos. 1214, 1257, and 1229 do not constitute a substantive due process violation.

## C.

Finally, we consider whether Clayland's equitable claims are moot. "Article III, § 2, of the Constitution confines federal courts to the decision of 'Cases' or 'Controversies.'" *Arizonans for Off. English v. Arizona*, 520 U.S. 43, 64 (1997). "A case is moot when it has 'lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law.'" *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1249 (4th Cir. 1991) (quoting *Diffenderfer v. Cent. Baptist Church of Miami Inc.*, 404 U.S. 412, 414 (1972) (per curiam)). Claims requesting prospective equitable relief on laws that no longer remain in effect are generally considered moot. *See Burke v. Barnes*, 479 U.S. 361, 363 (1987); *Diffenderfer*, 404 U.S. at 414–15.

Clayland argues that the district court erred in dismissing as moot its remaining claims seeking declaratory and injunctive relief. Those claims all seek prospective equitable relief on laws no longer in effect. Specifically, Clayland seeks a declaratory judgment that Bill Nos. 1214, 1257, and 1229 are void under Maryland law and an injunction prohibiting the County from enforcing Bill Nos. 1214, 1257, and 1229. The 2016 Comprehensive Plan and the 2018 Comprehensive Rezoning superseded all three of

these Bills. Under these circumstances, a declaratory judgment would constitute an advisory opinion.

Clayland argues that the district court may still grant it effectual relief on these claims. None of Clayland's arguments are availing. First, Clayland argues that the district court may grant its request "that it be allotted an amount of time equal to the moratorium period to develop[] its property under the property's zoning and other classifications as they existed prior to the 2018 rezoning absent the moratorium and unlawful tier map designations." Opening Br. at 54. Yet this amounts to a request that the district court enjoin the 2016 Comprehensive Plan and the 2018 Comprehensive Rezoning, neither of which Clayland has ever challenged. Second, Clayland asserts that it could obtain ancillary relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, if declaratory judgment were entered in its favor. But the Declaratory Judgment Act applies only in "a case of actual controversy." 28 U.S.C. § 2201(a). Here, because the equitable claims are moot, there is no live controversy. Third, Clayland asserts that it suffers continuing injury because "the Property remains improperly designated in Tiers III and IV," as the County incorporated Bill No. 1229 into the 2016 Comprehensive Plan. Opening Br. at 54. But, again, Clayland did not challenge the 2016 Comprehensive Plan. Ultimately, Clayland seeks remedies that are not available to it in this litigation.

Accordingly, Clayland's equitable claims are moot.

III.

The Camper family and the Camper siblings may have had personal aspirations to develop the Property. But personal aspirations do not rise to the level of a vested property right under Maryland law. We decline to delegitimize "a standard zoning tool whose legitimacy was recently upheld by the Supreme Court," *Quinn*, 862 F.3d at 437, on the basis of a speculative property right. For the foregoing reasons, the district court's judgment is

*AFFIRMED*.