**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1431**

---

TOM HUTTO, on behalf of himself as a Host and his Guests,

        Plaintiff - Appellant,

v.

CITY OF ROCK HILL,

        Defendant - Appellee.

---

Appeal from the United States District Court for the District of South Carolina, at Rock Hill.  Cameron McGowan Currie, Senior District Judge.  (0:23-cv-00970-CMC)

---

Argued:  March 19, 2026                          Decided:  April 27, 2026

---

Before WYNN, THACKER, and BERNER, Circuit Judges.

---

Affirmed by unpublished opinion.  Judge Wynn wrote the opinion, in which Judge Thacker and Judge Berner joined.

---

**ARGUED:**  Ina Shtukar Steinberg, BLACK & WHITE LAW, LLP, Rock Hill, South Carolina, for Appellant.  William Mark White, SPENCER & SPENCER, PA, Rock Hill, South Carolina, for Appellee.  **ON BRIEF:**  W. Chaplin Spencer, Jr., SPENCER & SPENCER, P.A., Rock Hill, South Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Like municipalities around the country, the city of Rock Hill, South Carolina ("Rock Hill") has had to contend with an increase in the number of properties being rented on a short-term basis through online platforms like Airbnb. Beginning in 2020, Rock Hill adopted regulations limiting how property owners can engage in short-term rentals ("STRs"), that is, rentals for thirty days or fewer.

Plaintiff Tom Hutto brought a variety of constitutional challenges to Rock Hill's regulations, but the district court granted summary judgment to the city. Because we agree that Hutto lacks standing to bring claims on behalf of his guests and that, as to his own claims, the regulations fit comfortably within Rock Hill's traditional zoning authority, we affirm.

I.

A.

Because this appeal concerns the district court's order granting summary judgment to Rock Hill, we relate the following facts in the light most favorable to Hutto as the non-movant. *Tederick v. LoanCare, LLC*, 168 F.4th 154, 162 (4th Cir. 2026).

Hutto has owned and operated rental properties in Rock Hill for many years. He initially rented them on a long-term basis. But, beginning around 2018, he converted some of his properties to STRs. He now has around a dozen STRs in Rock Hill. Most of his STR guests come from out of state and stay for a short period, like a weekend, while visiting friends or family or attending events like conferences.

Rock Hill first adopted regulations concerning STRs in 2020 (the "2020

2

Regulations"). The 2020 Regulations explained that the City Council found "that the provision of [STR] accommodations can be beneficial to the public if potential negative impacts are managed" because STRs "provide a means of assisting property owners with keeping properties in good order and repair" and "serve to bolster [Rock Hill]'s sports tourism industry." J.A. 429.[1] Still, they continued, regulation was important to avoid neighborhoods being "harmed by undue commercialization and disruption to" their "primary and overarching purpose" as "a residential community, where people actually live, not a place of transient occupancy." *Id.* The 2020 Regulations required STR hosts to obtain a permit certifying that, among other things, the unit would "not be marketed nor used as an event location or a party house," including for "weddings" and "holiday parties." J.A. 430. Permits were good for one year unless revoked.

Before Rock Hill adopted the 2020 Regulations, Hutto allowed small gatherings at his STRs for events like birthday parties and baby showers. After that point, however, he had to change that policy in order to obtain permits for his STRs. This meant that, after the 2020 Regulations took effect, he had to turn down some guests.

Rock Hill adopted amended regulations in December 2022 (the "2022 Regulations") and again in November 2023 (the "2023 Regulations"). In adopting the 2023 Regulations, the City Council explained that STRs had "led to citizen complaints involving revolving occupancy and turnover, excessive noise, disorderly conduct, traffic congestion, parking limitations, and trash accumulation." J.A. 2140. Therefore, Rock Hill would be limiting

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

STRs to "a reasonable number of commercially zoned areas." J.A. 2141. No new STRs would be permitted outside of those specified areas, and STRs that were permitted in other areas before November 2023—including all but three of Hutto's STRs—would be allowed to continue as STRs only for a five-year "amortization period." *Id.* The upshot is that, after 2028, only three of Hutto's current properties will be able to be used as STRs; the others "will need to be either eliminated or converted to long term hosting or traditional rentals." J.A. 2148.

B.

Hutto initially filed this lawsuit in response to the 2022 Regulations. Rock Hill adopted the 2023 Regulations in part to "try[] to address some of the concerns that were raised" in Hutto's complaint. J.A. 2159. After Rock Hill adopted the 2023 Regulations, Hutto revised his complaint to challenge those regulations.

The operative complaint asserted seven claims. Hutto brought two claims on behalf of his guests: violation of their First Amendment rights (count 2) and violation of their rights as out-of-state travelers under the Privileges and Immunities Clause (count 4). His other five claims, brought on his own behalf, alleged that Rock Hill engaged in First Amendment retaliation when it adopted revised regulations in response to his lawsuit (count 1), and also alleged violations of his fundamental right to livelihood (count 3), Equal Protection (count 5), substantive due process (count 6), and the Dormant Commerce Clause (count 7). He sought a declaratory judgment and money damages.

Conflicts arose between the parties regarding Rock Hill's invocation of legislative privilege during two depositions. After a hearing, the district court concluded that the two

4

deponents were "entitled to legislative privilege with respect to the questions propounded at their depositions that inquired into their respective legislative activities." J.A. 107. After the parties cross-moved for summary judgment, the district court granted summary judgment to Rock Hill on all claims. *Hutto v. City of Rock Hill*, No. 23-cv-970, 2025 WL 1189761, at *1 (D.S.C. Mar. 4, 2025). Hutto timely appealed.

II.

Hutto first challenges the district court's order permitting Rock Hill to invoke legislative privilege during the depositions of two policymakers: John Black, a City Council representative, and Leah Youngblood, the Director of Rock Hill's Planning and Development Department. We affirm.[2]

Legislative privilege arises from legislative immunity, which in turn arises from the Constitution's Speech or Debate Clause. *E.E.O.C. v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 180 (4th Cir. 2011). The Speech or Debate Clause only directly applies to federal legislators. Nevertheless, "[i]n recognition of [legislative] immunity's historical

---

[2] It is not entirely clear from this Court's precedent what standard of review applies. The parties agree that we review for abuse of discretion, and some circuits appear to agree. *E.g.*, *Parr v. Cougle*, 127 F.4th 967, 972 (5th Cir. 2025); *Pernell v. Fla. Bd. of Governors of the State Univ.*, 84 F.4th 1339, 1342, 1344 (11th Cir. 2023). However, in the context of the work-product and marital-communications privileges, we have adopted a more nuanced view, holding that "[w]e review evidentiary rulings, including rulings on privilege, for abuse of discretion, factual findings as to whether a privilege applies for clear error, and the application of legal principles de novo." *United States v. Caldwell*, 7 F.4th 191, 207 (4th Cir. 2021) (work product) (quoting *United States v. Hamilton*, 701 F.3d 404, 407 (4th Cir. 2012) (marital communications)). The Ninth Circuit has applied essentially the same analysis to an invocation of legislative privilege. *Lee v. City of Los Angeles*, 908 F.3d 1175, 1182 (9th Cir. 2018). Because we would affirm the district court's order under any standard of review, we need not resolve the matter here.

pedigree and practical importance[,] the Supreme Court has extended it to a wide range of legislative actors," including local legislators. *Id.* at 180–81 (citing *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998)). Legislative immunity "applies even where the legislative body to which the individual legislator belongs lacks immunity for its legislative acts"—such as a municipality subject to lawsuit under § 1983—"and it covers all those properly acting in a legislative capacity, not just actual officeholders." *Id.* at 181. "Legislative privilege against compulsory evidentiary process," for its part, "exists to safeguard this legislative immunity and to further encourage the republican values it promotes." *Id.* And "[b]ecause litigation's costs do not fall on named parties alone, this privilege applies whether or not the legislators themselves have been sued." *Id.* So Black and Youngblood were entitled to invoke legislative privilege for questions related to legislative deliberation, even though Black is a municipal, not federal, lawmaker; Youngblood is not a member of the City Council; and neither individual has themselves been sued.

To be sure, the extension of the legislative privilege to state and local lawmakers is not absolute. The Supreme Court held in *United States v. Gillock* "that where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields," and thus federal courts would not "recognize a legislative privilege barring the introduction of evidence of the legislative acts of a state legislator charged with taking bribes or otherwise obtaining money unlawfully through exploitation of his official position." *United States v. Gillock*, 445 U.S. 360, 362, 373 (1980).

More recently, the Supreme Court arguably recognized an additional area in which the legislative privilege as to state and local legislators yields, indicating that a three-judge

6

district court panel properly "required discovery into the motives of the officials who produced" a challenged congressional map, where the plaintiffs alleged that State "officials intentionally retaliated against them because of their political views." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (per curiam). In a single sentence in his Opening Brief, Hutto suggests that legislative privilege should give way in this case, contending that his First Amendment retaliation claim, like the retaliation claim in *Benisek*, required discovery into the officials' motives.

It is hard to know what to make of *Benisek*'s statement on this point. *Benisek* was a per curiam order issued without oral argument to resolve a request for a preliminary injunction. *Id.* at 161. *Benisek* did not cite *Gillock* or discuss why legislative privilege would not apply. *Id.* at 159. Its discussion of legislative privilege arose only in evaluating whether the "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request," thus arguably rendering as dicta its suggestion that discovery was appropriate. *Id.* at 160. It is therefore perhaps unsurprising that, five years after *Benisek*, the Eleventh Circuit stated that "[t]he Supreme Court has never expanded the *Gillock* exception beyond criminal cases." *Pernell v. Fla. Bd. of Governors of State Univ.*, 84 F.4th 1339, 1344 (11th Cir. 2023).

Even assuming, however, that the Supreme Court in *Benisek* blessed the expansion of *Gillock* beyond the criminal context into the redistricting context, Hutto provides no reason to believe the Court intended to extend it further to cover all constitutional retaliation claims. The three-judge district court in *Benisek* had cabined its discussion to "claims of legislative privilege *in redistricting cases*." *Benisek v. Lamone*, 241 F. Supp. 3d

7

566, 575 (D. Md. 2017) (emphasis added); *see also Tangipa v. Newsom*, --- F. Supp. 3d ---, No. 2:25-cv-10616, 2026 WL 110585, at *17 n.14 (C.D. Cal. Jan. 14, 2026) (noting that "legislative privilege is frequently invoked in redistricting cases," and collecting cases). While we do not foreclose the possibility that a plaintiff could successfully argue that *Benisek* opens the door to exceptions for other types of claims,[3] we do not take Hutto's mere citation to *Benisek* as sufficient to put forth an argument in favor of expanding the *Gillock* exception beyond its criminal context. *See United States v. Fernandez Sanchez*, 46 F.4th 211, 219 (4th Cir. 2022) ("Given the complexity of the issue, we cannot say [that a] single sentence [in a party's brief] suffices to preserve [the party]'s argument. And we decline the [party]'s unspoken invitation to wade through the case law and make its argument for it." (footnote omitted)).

We therefore affirm the district court's order permitting Black and Youngblood to invoke legislative privilege under the circumstances of this case.

### III.

Turning to the substance of Hutto's claims, the district court granted summary judgment to Rock Hill on all seven of those claims. This Court's review is de novo. *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023). We affirm.

### A.

Two of Hutto's claims, counts 2 and 4, explicitly seek to rectify alleged violations

---

[3] *But see Pernell*, 84 F.4th at 1344 (concluding that, "[i]n the light of *Gillock* and" other Supreme Court case law, "we cannot except civil-rights actions from the application of the legislative privilege").

8

of other people's constitutional rights.[4] Specifically, Hutto asserts that the 2023 Regulations violate his guests' First Amendment rights by limiting gatherings in certain areas of Rock Hill and his guests' rights under the Privileges and Immunities Clause by displaying hostility toward them, many of whom come from other states. The district court concluded that Hutto lacked third-party standing to pursue those claims. We agree.

"[L]itigants typically lack standing to assert the constitutional rights of third parties." *United States v. Hansen*, 599 U.S. 762, 769 (2023). However, the Supreme Court's precedents have permitted "a narrow class of litigants to assert the legal rights of others" under the "third-party standing" doctrine. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393 n.5 (2024). "For third party standing, a plaintiff must demonstrate (1) an injury-in-fact; (2) a close relationship between [the plaintiff] and the person whose right [he] seeks to assert; and (3) a hindrance to the third party's ability to protect his or her own interests." *Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 14 F.4th 276, 288 (4th Cir. 2021) (cleaned up).

The district court concluded that, at minimum, Hutto could not show that his guests were unable to protect their own interests. *Hutto*, 2025 WL 1189761, at *8. The court distinguished various Supreme Court cases permitting third-party standing and reasoned that, in this case, "[t]here is no risk of imminent mootness . . . ; no indication privacy concerns might deter [Hutto's guests] from suing . . . ; and no practical barriers preventing

---

[4] In his Opening Brief, Hutto insists that he also brought an Equal Protection claim on behalf of his guests. Even if so, such a claim fails for lack of standing for the reasons discussed herein.

9

them from asserting their own rights." *Id.* (cleaned up).

Hutto's only argument on this point on appeal is to state that it "defies all common sense" for the district court to conclude, on the one hand, that there are no practical barriers to STR guests protecting their rights while, in the same order, acknowledging that the guests "'are here today and gone tomorrow.'" Opening Br. at 16 n.23 (quoting *Hutto*, 2025 WL 1189761, at \*10). Hutto does not elaborate on this point or explain why STR guests could not protect their rights in advance of a stay by seeking injunctive relief[5] or after their stays by seeking money damages.

That is insufficient. "The burden of establishing standing falls to" the plaintiff. *Sheppheard v. Morrisey*, 143 F.4th 232, 243 (4th Cir. 2025). And third-party standing is very much the exception to the rule. *See Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 212 (4th Cir. 2025) (noting that "standing doctrine strongly disfavors so-called 'third party standing' cases" (cleaned up)). Hutto has not done enough to show that the short-term nature of his guests' stays poses such a significant barrier to their ability to protect their own rights that he must step into their shoes and bring claims on their behalf. *Cf. Keep Chi. Livable v. City of Chicago*, 913 F.3d 618, 623–24 (7th Cir. 2019) (finding no standing for two prior STR guests to challenge Chicago's STR ordinance, but only because the guests did not "convey with sufficient clarity or particularity whether they still wish to visit

---

[5] To the extent Hutto's reference to the brevity of STR guests' stays is intended to argue that a guest's lawsuit for injunctive relief would run the risk of imminently becoming moot, he does not grapple with whether such a lawsuit would fall within the capable-of-repetition-yet-evading-review exception to mootness. So we do not comment further on such a hypothetical situation.

10

Chicago and, if so, how the Ordinance is chilling or inhibiting them from doing so").

We affirm the district court's order granting summary judgment to Rock Hill on counts 2 and 4 because Hutto lacks standing to pursue those claims.

B.

Next, Hutto alleges that the 2023 Regulations were enacted in retaliation for the lawsuit he brought to challenge the 2022 Regulations (count 1). We affirm the district court's grant of summary judgment to Rock Hill on this claim.

Under the First Amendment, government officials may not retaliate against an individual "for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). But to prevail on a First Amendment retaliation claim, the plaintiff must show that "the government defendant's retaliatory animus" was "a but-for cause" of the plaintiff's injury, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 398–99 (cleaned up).

The 2023 Regulations were plainly adopted in response to Hutto's lawsuit; Youngblood stated exactly that in a 2023 Planning Commission meeting. *See* J.A. 2159 ("[T]here was a lawsuit filed that spoke to this. And so we're trying to address some of the concerns that were raised there."). And, while Hutto agrees that the 2023 Regulations "eliminate[d] some of the most offensive provisions" of the 2022 Regulations "identified in" his original complaint, Opening Br. at 4 n.10, we will assume that the 2023 Regulations were adverse to Hutto in at least some respects.

Even so, Hutto has pointed to no evidence that Rock Hill's motive was a retaliatory

11

one.[6] *See Sanimax USA, LLC v. City of South St. Paul*, 95 F.4th 551, 559 (8th Cir. 2024) ("[A]dding clarity to an ordinance out of concern that the ordinance could be challenged is not retaliation for protected activity." (cleaned up)). The 2023 Regulations "appl[y] equally" to anyone who wishes to run a STR, not just Hutto. *Siena Corp. v. Mayor & City Council of Rockville*, 873 F.3d 456, 464 (4th Cir. 2017). And we have previously held that, even when a particular facility "provide[s] the impetus for a general zoning enactment, . . . that does not mean the enactment is aimed solely at that facility. Nor does every loser in a zoning dispute have by virtue of the unfavorable outcome a so-called 'targeting' claim." *Id.*

We therefore affirm the district court's decision to grant summary judgment to Rock Hill on this claim.

C.

Hutto next contends that the 2023 Regulations violate his "fundamental right to livelihood" (count 3). J.A. 69 (capitalization altered). We disagree.

To be sure, the Supreme Court "has indicated that the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment." *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999). But it has also clarified that this right "is nevertheless subject to reasonable

---

[6] Hutto's briefs gesture at comments made by an individual member of City Council, but he does not address the district court's reasons for disregarding those statements. *See Hutto*, 2025 WL 1189761, at *6 n.5. We therefore decline to consider those statements. *See Parkins ex rel. Turner v. McMaster*, No. 23-1341, 2024 WL 4490632, at *2 (4th Cir. Oct. 15, 2024) (per curiam) (concluding that an opening brief's "fail[ure] to grapple with the grounds the district court relied on to dismiss" a claim "constitutes waiver").

12

government regulation." *Id.* at 292. So, rational-basis review applies. *See Doe v. Settle*, 24 F.4th 932, 953 (4th Cir. 2022) ("A substantive due process challenge is considered under rational-basis review unless some fundamental right is implicated."); *Prynne v. Settle*, 848 F. App'x 93, 104 (4th Cir. 2021) ("[A] restriction on the conduct of a profession will run afoul of substantive due process rights only if it is irrational." (quoting *Litmon v. Harris*, 768 F.3d 1237, 1242 (9th Cir. 2014))). We readily agree with the district court that this zoning ordinance survives rational-basis review.

Rational-basis review "represents a powerful presumption of validity. The showing required to overturn that presumption is steep. A challenger must show there is no rational relationship between the disparity of treatment and some legitimate governmental purpose. The state need not make any showing; no evidence of any kind is required; reasonable speculation is enough. As for the justification, any conceivable reason will do. It does not matter what motivated the classification. Nor is there any place in rational-basis review to question the wisdom or logic of a state's legislation; rough line-drawing, even illogical or unscientific line drawing, is often necessary to governing. And unlike higher levels of scrutiny, there is no tailoring requirement under rational-basis review. All that is needed is an imperfect fit between a plausible reason and some legitimate end. In total, this test requires an extraordinary showing by a plaintiff like [Hutto]: He must negate every conceivable basis which might support the legislation." *Doe*, 24 F.4th at 943–44 (cleaned up). Additionally, the "analysis looks not to the subjective motivations of the local officials. The test is simply whether the governmental end is legitimate and whether the means chosen to further that end are rationally related to it." *Siena Corp.*, 873 F.3d at 465.

13

Hutto does not come close to making the demanding showing required here. "[T]he 2023 [Regulations are] rationally related to [Rock Hill]'s legitimate interests in preserving its housing stock and maintaining the residential character of its neighborhoods." *Hutto*, 2025 WL 1189761, at \*13; *cf. Diamond Sands Apartments, LLC v. Clark County*, 164 F.4th 759, 764 (9th Cir. 2026) (concluding that similar concerns "suppl[ied] a rational basis" for fining apartment complex that failed to abide by STR restriction); *Nekrilov v. City of Jersey City*, 45 F.4th 662, 679 (3d Cir. 2022) (concluding that similar concerns constituted a "legitimate public purpose for" adopting STR ordinance). Hutto is certainly free to disagree that those are good motives, and he may well be right that they were not Rock Hill's true motives. But the fact that those plausible motives exist is enough to doom this claim.

D.

Hutto also alleges that the 2023 Regulations violate his right to equal protection as an STR host (count 5). He contends that the Regulations treat STR hosts differently than other property owners and local homeowners associations, who "can host guests and even events in residential communities." J.A. 78. But his claim is unsupported by the record.

The Equal Protection Clause of the Fourteenth Amendment "does not take from the States all power of classification, but keeps governmental decisionmakers from treating differently persons *who are in all relevant respects alike*." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) (emphasis added) (cleaned up). Thus, "[t]o succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds

14

to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*

The district court concluded that "Hutto's equal protection claim fails at the outset" because "STR hosts have not been treated differently from any similarly situated property owners." *Hutto*, 2025 WL 1189761, at *12. We agree.

Hutto is not treated any differently from other individual property owners; they, too, cannot operate STRs in certain areas of Rock Hill. And the rules for social gatherings apply equally to everyone: Hutto can host gatherings at his private properties, as long as they are not STRs, and other property owners cannot host gatherings at STRs, either. Similarly, an STR is not "in all relevant respects []like" a homeowners association; they are entirely different types of entities. *Morrison*, 239 F.3d at 654. So the district court correctly granted summary judgment to Rock Hill on this claim.

E.

Hutto further alleges a violation of his substantive due process rights, contending that the 2023 Regulations deprive him of a vested property right (count 6). "To establish a substantive due process violation, a plaintiff must demonstrate (1) that he had property or a property interest; (2) that the state deprived him of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *Clayland Farm Enters., LLC v. Talbot County*, 987 F.3d 346, 356–57 (4th Cir. 2021) (cleaned up). The last prong presents "a particularly high hurdle in the zoning context: it must be clear that the state's action has no foundation in reason and is a mere arbitrary or irrational exercise of power having no

15

substantial relation to the public health or public safety." *Id.* at 357 (cleaned up). Thus, "in the zoning context," a claim for substantive due process "can survive only if the alleged purpose behind the state action has no conceivable rational relationship to the exercise of the state's traditional police power through zoning." *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 827 (4th Cir. 1995); *see also id.* at 829 n.7 ("[S]ubstantive due process inquires into the conceivable outer limits of legitimate government power.").

Even assuming Hutto possessed a property interest, cognizable under South Carolina law, in using his properties specifically as STRs, the 2023 Regulations were "rationally related to the [City]'s zoning powers," for the same reasons they satisfy rational-basis review. *Clayland Farm Enters.*, 987 F.3d at 357; *see Siena Corp.*, 873 F.3d at 464 ("The enactment represented nothing more than the ordinary exercise of a state's residual police power in land use and zoning, in which the state has long maintained a primary and sovereign interest."); *see also Nekrilov*, 45 F.4th at 680–81 (rejecting claim for violation of substantive due process where STR ordinance was based on similar "legitimate state interests" as those articulated here).

F.

Finally, in Count 7, Hutto alleges a violation of the Dormant Commerce Clause, claiming that the 2023 Regulations burden interstate commerce by discriminating against out-of-state guests.[7] But there is no evidence of discrimination against out-of-state guests.

---

[7] Hutto has standing to raise a Dormant Commerce Clause challenge, unlike some of his other claims, because this claim is brought on his own behalf as an STR owner and operator rather than on behalf of his guests. *Cf. N. Va. Hemp & Agric., LLC v. Virginia*,

16

Both in-state and out-of-state individuals use STRs, and out-of-state individuals can still stay in STRs within the permitted areas or in myriad other accommodations. *Cf. Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 452 (9th Cir. 2019) ("Land use regulations are inherently local. They are not a significant burden on interstate commerce merely because they disappoint would-be visitors from out of state.").

## IV.

As we have recognized, "matters of zoning are inherently political." *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 329 (4th Cir. 2005). And "[w]hile [Hutto] obviously does not relish the result, displeasure with state" or municipal "democratic outcomes does not ordinarily rise to the level of a federal constitutional violation." *Siena Corp.*, 873 F.3d at 465. Hutto has not persuaded us that the district court erred in rejecting any of his constitutional claims.[8] We therefore affirm the district court's

---

125 F.4th 472, 488–89 (4th Cir. 2025) (plaintiffs lacked standing to raise Dormant Commerce Clause challenge where they were purchasers, not suppliers, and thus not directly regulated).

[8] Hutto unsuccessfully moved below for the district judge to recuse herself "due to deep-seated and continuous personal dislike towards [his counsel], as well as preconceived strong beliefs about the subject matter of this litigation not based on the facts introduced or events occurring in the course of the case *sub judice*, which place the Court's impartiality at issue." Motion to Recuse at 1, *Hutto v. City of Rock Hill*, No. 23-cv-970 (D.S.C. Oct. 4, 2024), Dkt. No. 87. Hutto's appellate briefs are similarly replete with allegations that the district court rendered its decision out of improper bias against him or his counsel. To provide just a sampling, the Opening Brief states that "the [district] court's handling of the case cannot be explained by anything other than deliberate partiality" and that the court engaged in "advocacy from the bench" that was "unseemly of its role." Opening Br. at 12 n.15, 15 n.20, 32.

Counsel is reminded that allegations of judicial bias are extremely serious and not to be thrown about lightly because a court ruled in a way a party did not like. A judge who "has a personal bias or prejudice concerning a party" is required, by statute, to disqualify

order granting summary judgment to Rock Hill on all claims.

*AFFIRMED*

---

herself from the proceeding. 28 U.S.C. § 455(b)(1). Indeed, she is required to disqualify herself "in any proceeding in which [her] impartiality might reasonably be questioned." *Id.* § 455(a). But the case law makes clear that the statute sets a high bar: "[W]hile recusal motions serve as an important safeguard against truly egregious conduct, they cannot become a form of brushback pitch for litigants to hurl at judges who do not rule in their favor." *Belue v. Leventhal*, 640 F.3d 567, 574 (4th Cir. 2011). If Hutto's counsel had any real evidence of bias, she could have appealed the denial of the recusal motion. Absent such a well-supported appeal, counsel's generalized allegations of partiality are not well-taken.