# United States Court of Appeals
## For the Eighth Circuit
_____

No. 23-1579
_____

Sanimax USA, LLC

*Plaintiff - Appellant*

v.

City of South St. Paul

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 18, 2023
Filed: March 1, 2024
_____

Before BENTON, SHEPHERD, and KELLY, Circuit Judges.
_____

SHPEHERD, Circuit Judge.

Sanimax USA, LLC, sued the City of South Saint Paul, Minnesota, under 42 U.S.C. § 1983, challenging the validity of a zoning ordinance that designated its business as a nonconforming use. Sanimax later filed a second § 1983 action against the City challenging the validity of an odor ordinance under which it had been cited and fined for noncompliance. In its first lawsuit, Sanimax raised a First Amendment retaliation claim and an Equal Protection class-of-one claim; in its second lawsuit,

Sanimax advanced a void-for-vagueness claim and another First Amendment retaliation claim. The cases were consolidated, and the district court[1] granted the City's motion for summary judgment on all counts. Sanimax renews its claims on appeal, arguing that summary judgment is premature because a genuine dispute of material fact exists for each of its alleged constitutional injuries. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

For more than a century, South Saint Paul was the center of a vibrant livestock and meatpacking trade. Located in the City's Industrial zoning district along the Mississippi River, stockyards and packing facilities served as the backbone of the community's workforce, at one time employing more than 10,000 people. As conditions changed, however, many industry-related businesses closed, and the last stockyards shut their gates in 2008. Endeavoring to stimulate economic growth, the City redeveloped a portion of the Industrial district into the BridgePoint Business Park, which saw various light industrial firms and offices open in the area. But some businesses associated with the old meatpacking industry remained, including slaughtering, rendering, and hide-processing facilities.

It was against this backdrop that the City adopted its 2030 Comprehensive Plan setting forth future land use policies. The Comprehensive Plan aimed to create a "new image" for South Saint Paul and reaffirmed the City's commitment to developing BridgePoint as a "modern commerce" hub. It also identified Interstate 494, which bisects the Industrial district and forms the southern border of BridgePoint, as a "gateway to the community" and a corridor through which the City could showcase ongoing redevelopment efforts. To reflect the significant changes to the area that had already occurred, and to encourage aesthetic uniformity, the

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

Comprehensive Plan prospectively guided land north and south of Interstate 494 from Industrial to Light Industrial.

The Comprehensive Plan also noted the City's ongoing battle with foul odors—a negative externality of the once-prodigious meatpacking industry—now perpetuated by the remaining establishments that continued to operate among the new crop of businesses that had opened in recent years. The presence of nuisance odors had stymied development in the area, the Comprehensive Plan found; accordingly, it was imperative that the City work with "holdover industries" to identify and mitigate odor issues moving forward.

Sanimax is one such holdover industry. For decades, it has operated a rendering plant in South Saint Paul that processes animal carcasses and organic byproducts for use in other goods. Sanimax's manufacturing processes emit pungent, foul odors that often drift beyond the boundaries of its property, drawing the ire of nearby residents and businesses. Sanimax is aware of its odor problem but maintains that the processing of organic materials is an inexorably malodorous task. In recent years, it has invested significant resources in odor-abatement technology and has, on several occasions, met with the City regarding the issue. Despite its proactive efforts, however, Sanimax has been the subject of numerous odor complaints lodged by disgruntled residents. As reflected in the Comprehensive Plan, addressing the pervasiveness of industrial odors in South Saint Paul, including those emanating from Sanimax's facility, was a priority for the City.

In 2014, the City enacted its first ordinance regulating odor pollution. Section 110-142 of the Ordinance prohibited odor emissions that: (1) "Create odors or smells which are offensive or obnoxious to another person within the City"; (2) "Create a detrimental effect on the property of another person in the City"; or (3) "Unreasonably interfere with the enjoyment of life, health, safety, peace, comfort, or property of another person in the City." The Ordinance also created an enforcement scheme under which properties identified as potential odor emitters would be required to submit to independent odor testing. Specifically, the testing

requirement applied both to properties identified by a previous study as potential odor emitters and those that were the subject of seven "verifiable odor complaints" within a six-month period; a complaint was "verified" if the City Engineer confirmed that a property was the source of the emission that precipitated the complaint. The Ordinance also empowered the City Engineer, pursuant to the results of the odor testing, to designate a property as a "Significant Odor Generator" and require it to develop an odor management plan in consultation with the City detailing proposed operational changes, technologies, and monitoring efforts intended to mitigate future emissions.

The City retained Short Elliot Hendrickson, Inc. (SEH) to monitor the fugitive emissions of properties identified as potential designees under the Ordinance. Pursuant to SEH's testing recommendation, the City deemed Sanimax a Significant Odor Generator in 2015. Sanimax appealed, and the City agreed to rescind the designation upon securing Sanimax's commitment to, among other things, meet regularly with the City to discuss odor-abatement strategies. These collaborative efforts were apparently unfruitful because the City designated Sanimax as a Significant Odor Generator once more in 2016. Sanimax responded by filing a lawsuit challenging the Ordinance as unconstitutionally vague, but it voluntarily dismissed the action after the City agreed to rescind the second designation.

In 2017, the City enacted another odor ordinance amending the Significant Odor Generator designation criteria established by the 2014 Odor Ordinance. Whereas the 2014 Odor Ordinance empowered the City Engineer to designate a property as a Significant Odor Generator based solely on the results of independent odor testing, the 2017 Odor Ordinance additionally required that the property generate seven verifiable odor complaints within a six-month period before such a designation could be made. Moreover, to verify a complaint, the 2017 Odor Ordinance required the City Engineer to confirm both that the property was the source of the emission that precipitated the complaint, and that the property

generated a dilution-to-threshold ratio of seven or more odor units, as measured using a Nasal Ranger olfactometer.[2]

The City also sought to implement zoning changes pursuant to the 2030 Comprehensive Plan. In 2017, it proposed an ordinance that would subdivide the existing Industrial district into I-1 Light Industrial, which encompassed Sanimax's property and most of the land north of Interstate 494, and I-2 Medium Industrial, which consisted of land south of Interstate 494. To reflect the shift from heavy industrial to light industrial uses in the BridgePoint area, the I-1 district prohibited the "processing of grease or organics into by-products" and the "rendering, reclaiming or processing of animals or meat by-products." Instead, such activities were to be permitted as conditional uses in the I-2 district. In a letter to City officials, Sanimax argued that the City lacked a rational basis on which to "target" its business, and the proposed 2017 Zoning Ordinance did not advance beyond the Planning Commission.

The City enacted Ordinance 1350 in 2019 (2019 Zoning Ordinance), which largely accomplished the objectives of the proposed 2017 Zoning Ordinance by creating a 115-parcel I-1 Light Industrial district. The I-1 district encompassed Sanimax's property, and it prohibited the same uses as those enumerated in the proposed 2017 Zoning Ordinance, but the geographic scope of the I-1 district was now narrower. Unlike the proposed 2017 Zoning Ordinance, in which the I-1 district spanned south of Interstate 494 to Richmond Street, the 2019 Zoning Ordinance instead used Interstate 494 as the district's southern boundary, leaving the remaining land south of the Interstate zoned Industrial. The 2019 Zoning Ordinance rendered

---

[2]A Nasal Ranger is a device utilized in the field of scentometry to measure the strength of an odor based on the ability to smell the odor after diluting ambient air with non-odorous, carbon-filtered air. An odor panelist places the Nasal Ranger on his nose and uses the device's six carbon-filtered positions (2, 4, 7, 15, 30, 60) to measure the amount of carbon-filtered air needed to render an odor undetectable. This measurement produces the dilution-to-threshold ratio; an odor concentration with a dilution-to-threshold ratio of seven is described as "objectionable."

Sanimax's business a legal nonconforming use, pursuant to which Sanimax could continue to operate—but could not expand—its business.

Meanwhile, the City found that its odor legislation, which created the Significant Odor Generator designation and concomitant odor management plan requirement, lacked an adequate enforcement mechanism to address fugitive emissions from businesses that were "not willing to take a collaborative approach and work with the City." Under the 2017 Odor Ordinance, for example, Significant Odor Generators that failed to comply with the Ordinance's requirements enjoyed a 12-month grace period before administrative penalties began to accrue. As a result, odor complaints from frustrated residents persisted—and indeed sharply increased—as people spent more time outdoors during the COVID-19 pandemic.

To curate an approach with "teeth" sufficient to address uncooperative businesses, the City enacted Ordinance 1356 in 2020 (2020 Odor Ordinance), which created a "two-track system" for remedying odor emissions. Pursuant to this new Ordinance, the City could, in its discretion, place an odor emitter on Track One, a "friendly" approach intended for businesses "interested in collaborating with the City . . . to reduce odors," or the "more punitive" Track Two, designed for businesses "that decline to work with the City." Track One was, in effect, the existing odor management plan procedure established by the 2014 Odor Ordinance requiring a property designated as a Significant Odor Generator to consult with the City to develop mitigation strategies. Track Two instead employed the existing administrative citation process used for standard code enforcement violations. Accordingly, the 2020 Odor Ordinance empowered the City to place an odor-emitting business on Track Two and immediately issue administrative citations.

The City soon received numerous complaints regarding "burnt, dead, rotting" odors emanating from Sanimax's property. The City's odor consultant, SEH, independently verified the complaints using a Nasal Ranger, and the City subsequently transmitted a warning letter informing Sanimax that its facility had

-6-

thrice violated § 110-142 of the City Code prohibiting the emission of offensive odors. The letter stated that "[a] nasal Ranger measurement is not necessary to establish that an odor is offensive, detrimental to other properties, or unreasonably interferes with [the] peace, comfort[,] and enjoyment of another's property," but it continued: "You must bring the Sanimax Property into compliance by ceasing and desisting from emitting offensive odors, specifically, odors that are detectable at a level of 7 odor units or higher, as measured from a location not on the Sanimax Property." Sanimax has since received 20 administrative citations for violating § 110-142 and has accrued $35,000 in fines. Before the City issued each citation, SEH verified that Sanimax's property was the source of the odor complaint, and that the strength of the emission was at least seven odor units.

In 2020, Sanimax filed an action under 42 U.S.C. § 1983 challenging the constitutionality of the 2019 Zoning Ordinance, alleging that the City retaliated against Sanimax for engaging in conduct protected by the First Amendment; namely, contesting the 2014 Odor Ordinance and the proposed 2017 Zoning Ordinance. It also contended that the 2019 Zoning Ordinance violated the Equal Protection Clause of the Fourteenth Amendment by excluding similarly situated businesses from the I-1 Light Industrial district and treating Sanimax as a "class of one." That same year, Sanimax filed a second § 1983 action against the City alleging that the 2020 Odor Ordinance was unconstitutionally vague, in violation of the Due Process Clause of the Fourteenth Amendment. It also alleged a First Amendment retaliation claim based on the same protected conduct raised in the first lawsuit.

The cases were consolidated, and the district court granted the City's motion for summary judgment on all claims. The district court found that Sanimax failed to establish but-for causation for either of the First Amendment retaliation claims, stating that "no reasonable jury could conclude that the 2019 [Zoning] Ordinance and the 2020 Odor [Ordinance] would not have been adopted absent Sanimax's protected conduct." It additionally rejected the Equal Protection class-of-one claim upon finding that Sanimax's facility had generated scores of odor complaints and thus was not similarly situated to its comparators, Twin City Hide and Twin City

Tanning. The district court concluded that the void-for-vagueness claim failed, finding that Sanimax received adequate notice of the proscribed conduct and that the City did not arbitrarily enforce the 2020 Odor Ordinance. Sanimax renews its four claims on appeal, arguing that the district court misapplied the summary judgment standard.

## II.

We review de novo a district court's grant of summary judgment, "viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." Richardson v. Omaha Sch. Dist., 957 F.3d 869, 876 (8th Cir. 2020) (citation omitted). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a district court must not "weigh evidence or make credibility determinations." Danker v. City of Council Bluffs, 53 F.4th 420, 423 (8th Cir. 2022).

## A.

We begin with Sanimax's First Amendment retaliation claims. "'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019) (alteration in original) (citation omitted). To prevail, Sanimax must show that: "(1) [it] engaged in a protected activity, (2) [the City] took adverse action against [it] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." De Rossitte v. Correct Care Solutions, LLC, 22 F.4th 796, 804 (8th Cir. 2022) (citation omitted). The parties dispute only the third element on appeal. "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." Nieves, 139 S. Ct. at 1722. Thus, to satisfy the third element of a retaliation

claim, Sanimax "must show the protected activity was a '"but-for cause" of the adverse action,'" in that it "would not have been taken absent [a] retaliatory motive." De Rossitte, 22 F.4th at 804 (alteration in original) (citation omitted).

Sanimax first asserts that the district court erroneously disregarded three internal City emails demonstrating that Sanimax's prior administrative and legal challenges were the but-for cause of the 2020 Odor Ordinance. Cited as the retaliatory "smoking gun" is an email from the City Planner to employees of SEH in which the City Planner commented on the futility of designating Sanimax as a Significant Odor Generator for a third time because the City's 2017 Odor Ordinance was "not strong enough to go up against their legal team." The City Planner then suggested two alternative strategies to combat Sanimax's odor problem: The City could implement an "odor tax" and issue an administrative citation for every verified odor complaint that SEH attributed to Sanimax's facility, or it could request that the Minnesota Pollution Control Agency conduct an enforcement action. As indicated by the enactment of the 2020 Odor Ordinance, the City pursued the first alternative.

Sanimax argues that this email alone warrants reversal, as it "shows that but for Sanimax's challenge to the [Significant Odor Generator] designations, the 2020 Odor [Ordinance] would not exist." By making this argument, however, Sanimax paints but-for causation with exceedingly broad strokes and attempts to excise the retaliatory animus element from the analysis. See Aldridge v. City of St. Louis, 75 F.4th 895, 899 (8th Cir. 2023) (noting the requirement under a retaliation claim that the defendant "would not have taken the adverse action but for harboring 'retaliatory animus' against the plaintiff[]" (citation omitted). Even if the City adopted the 2020 Odor Ordinance in response to Sanimax's challenges to the 2017 Odor Ordinance, to find that it did so to *retaliate* against Sanimax would require this Court to draw an unreasonable inference from the record. Rather, the record supports the conclusion that the City amended its odor-control strategy with the 2020 Odor Ordinance because the current approach was unlikely to survive a legal challenge. As the district court opined, "adding clarity to an ordinance out of concern that the ordinance could be challenged is not retaliation for protected activity."

Extrapolating Sanimax's argument underscores its untenability: A plaintiff affected by a local regulation could unilaterally hamstring municipal lawmakers in perpetuity by merely challenging the regulation's effect, as any attempt by the municipality to thereafter amend the law would necessarily be in response to—and thus in "retaliation" for—the initial challenge brought by the plaintiff. Sanimax has cited no case adopting such a broad conception of but-for causation in the retaliation context, and we will not be the first to so hold.

The remaining emails fare no better in the analysis. In the second communication, the City Planning Division Manager wrote to other employees that the City was seeking to enact the 2020 Odor Ordinance to allow it to fine Sanimax as an alternative to requiring the development of an odor management plan pursuant to a third Significant Odor Generator designation. And in the third communication, the City Planner informed a representative of SEH that the City had adopted the 2020 Odor Ordinance implementing the two-track system, remarking that "[f]or a noncooperative business like Sanimax, our intent is to use 'Track 2' . . . to punish them to the maximum extent that our Code allows for all violations."

Sanimax again urges this Court to draw an unreasonable inference from these emails by concluding that the City intended to punish Sanimax for challenging its previous Significant Odor Generator designations rather than for its failure to curb bothersome odor emissions. It is undisputed that the City has identified odor abatement as a priority since at least 2008 when it adopted the 2030 Comprehensive Plan. In the years that followed, the City approved Sanimax's request for a Planned Unit Development (PUD) and a related amendment allowing for a facility expansion of over 60,000 square feet, but it conditioned the approvals on Sanimax's agreement to submit information regarding odor impacts, to engage an independent odor-testing agency, and to meet with the City on a quarterly basis regarding its odor problem. In response to another requested PUD amendment, the City noted a "growing public sentiment" that odor abatement "should be the sole focus" of any future construction projects on Sanimax's property.

To this end, Sanimax took a proactive approach to the issue by purportedly investing $1 million in odor-mitigation technology and meeting consistently with the City to discuss strategies for improvement. Moreover, Sanimax's plant manager regularly apprised the City Planning Division Manager of any processing failures that had occurred at the facility and the efforts that were made to contain the resulting odors. By its own admission, however, Sanimax's proactive communications with the City waned as the years progressed. Around the same time, the number of odor complaints attributed to Sanimax's facility increased, on one occasion prompting its environmental specialist to compile an odor complaint report recommending remedial measures. 2018 marked the last time that Sanimax approached the City with a request for a PUD amendment to install additional odor-abatement equipment, but it later abandoned the proposal and offered no substitute. That same year, Sanimax's odor emissions were the subject of a class action, which it settled after agreeing to invest in new mitigation technology.

The multitude of odor complaints lodged with the City regarding Sanimax's facility, in which residents vividly described "eye-watering," "putrid" odors that reeked of "death" and smelled like "manure" and "burning flesh," further reflected the public's discontent. Some residents complained of headaches and remarked that the presence of odors prevented them from relaxing in their yards or opening the windows to their homes. Others pleaded with the City to "stop the madness," with some questioning their continued residence in South Saint Paul. Moreover, a nearby business remarked that Sanimax's odors were "impacting the ability of several employees to perform their job functions."

City leaders were thus faced with an acute odor problem and an increasingly frustrated constituency. And as evidenced by the quantity of complaints received in 2019 and 2020, the City's existing odor legislation—the 2017 Odor Ordinance—did little to quell residents' concerns. In response, the City altered its approach with the 2020 Odor Ordinance to create an additional avenue through which it could enforce odor violations. The remaining two emails which Sanimax references above merely reflect the City's reasoning for doing so. Although Sanimax contends that the only

-11-

evidence of its "non-cooperation," as referenced in the third email from the City Planner to an SEH employee, consisted of its earlier challenges to the Significant Odor Generator designations, the record reveals that Sanimax's unremitting odor problem, rather than its protected conduct, served as the impetus for the 2020 Odor Ordinance.

B.

We also reject Sanimax's attempt to establish but-for causation on its second retaliation claim challenging the 2019 Zoning Ordinance. To support its theory, Sanimax cites additional emails authored in 2016 and 2017 by City employees. Three of these communications reflect the City's prior efforts to remedy Sanimax's odor problem by designating its property as a Significant Odor Generator and requiring the development of an odor management plan. These exchanges merely show the City's then-existing odor abatement approach under the 2014 and 2017 Odor Ordinances, under which the Significant Odor Generator designation was the primary tool of enforcement. Sanimax also points to an additional email in which SEH stated that it could streamline its odor monitoring efforts by "just targeting Sanimax." The comment was made in response to the City Planner's request that SEH reallocate resources from proactive odor monitoring to odor complaint response; to satisfy this request, SEH suggested that it could conduct observations near only Sanimax's property, "with a contingency for" observing other odor emitters if those properties also become "complacent with odor control." Again, this email does nothing to establish that the City retaliated against Sanimax for engaging in protected conduct. Rather, the City had expended significant funds retaining SEH as its odor consultant and had identified odor complaint response as a priority for its residents. Moreover, the City did not adopt the suggestion, as SEH continued to monitor other odor emitters during that timeframe.

Additionally, Sanimax asserts that the 2019 Zoning Ordinance conflicts with the 2030 Comprehensive Plan and that the district court consequently erred by finding that the City's zoning actions predated Sanimax's protected conduct, thus

-12-

vitiating but-for causation.  As adopted in 2008, the Comprehensive Plan identified the Interstate 494 Corridor, which bisected the Industrial zoning district and extended north to Armour Avenue and south to Richmond Street, as an "important gateway" to South Saint Paul and an area in which the City could "showcase" its transition away from heavy industrial uses.  To this end, the Comprehensive Plan prospectively guided much of the Industrial zoning district, including Sanimax's property, as I-1 Light Industrial.  The boundaries of the proposed I-1 district identified in the Comprehensive Plan expanded north beyond Armour Avenue and south to Richmond Street.  But the City instead selected Interstate 494, rather than Richmond Street, as the I-1 district's southern border in the 2019 Zoning Ordinance.

Sanimax contends that this geographic deviation from the Comprehensive Plan evidences the City's retaliatory intent, as it leaves other odor-emitting businesses between Interstate 494 and Richmond Street zoned Industrial.  We disagree, as the change merely reflects the realities of pluralistic governmental decision-making.  The City previously attempted to carry out the Comprehensive Plan's objectives with the proposed 2017 Zoning Ordinance, which devised two alternative proposals: the first proposal adhered to the I-1 boundary lines set forth in the Comprehensive Plan and rezoned properties south of Richmond Street as I-2 Medium Industrial; the second proposal selected Interstate 494 as the I-1 district's southern boundary, which also served as the I-2 district's northern boundary.  Neither option garnered a consensus in the City Council, and the Ordinance failed to advance beyond the early planning stage.  The City therefore revised its approach with the 2019 Zoning Ordinance, finding it optimal to proceed by rezoning the section of the Industrial district north of Interstate 494 on which a consensus existed, since the rezoning of properties to the south was a "work in progress."  In this vein, the area north of Interstate 494, including the BridgePoint Business Park where Sanimax was located,[3] had experienced significant redevelopment to light industrial

---

[3]Although Sanimax asserts that its property is not located within BridgePoint, the 2030 Comprehensive Plan states that the business park is bordered by Concord Street, the Mississippi River, and Interstate 494.  Sanimax's property falls squarely within these boundaries.

uses, while the area south of the Interstate had yet to experience a comparable transition.

Accordingly, nowhere does the record indicate, or allow this Court to reasonably infer, that the City enacted the 2019 Zoning Ordinance to retaliate against Sanimax for its protected conduct. Sanimax's argument insinuates that the City was required to implement the entirety of the Comprehensive Plan's zoning objectives at once, lest it run afoul of the Constitution. In the Equal Protection context, the Supreme Court has stated that "legislature[s] must be allowed leeway to approach a perceived problem incrementally." FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 316 (1993). We find this admonition instructive here given that Sanimax essentially challenges the decision of a legislative body to incrementally rezone a large swath of land encompassing 115 parcels. Indeed, a draft of the 2040 Comprehensive Plan, published in 2019, expresses the City's desire to eventually transition the area south of Interstate 494 to mixed use and articulates a timeframe for doing so. That the City deferred the rezoning of this area does not render the 2019 Zoning Ordinance inconsistent with the 2030 Comprehensive Plan. See Mendota Golf, LLP v. City of Mendota Heights, 708 N.W.2d 162, 174 (Minn. 2006) ("Because land use planning and regulation are within a city's legislative prerogative, the city has broad discretion when it makes decisions in that arena."). Likewise, we find unpersuasive Sanimax's argument that the City "abandon[ed]" the 2030 Comprehensive Plan by updating the 2040 Comprehensive Plan's land use map to reflect the I-1 zoning change. See Minn Stat. 462.353 (enumerating the power of a municipality to amend its comprehensive plan).

Thus, Sanimax's property has been guided for light industrial uses since the City adopted the 2030 Comprehensive Plan, years before Sanimax engaged in protected activity. The 2019 Zoning Ordinance implemented the Comprehensive Plan's prospective zoning guidance by creating the I-1 Light Industrial district, which in turn furthered the City's goal of transitioning away from the heavy industrial uses that once dominated the area. See Musco Propane, LLP v. Town of Wolcott Plan. & Zoning Comm'n, 536 F. App'x 35, 39-40 & n.2 (2d. Cir. 2013)

-14-

(finding no retaliatory causation where each adverse action taken by a municipal zoning commission against the plaintiff "was logically connected" to and a "natural outgrowth of" an event that occurred before the plaintiff engaged in protected conduct); cf. Burkhart v. Am. Railcar Indus., 603 F.3d 472, 477 (8th Cir. 2010) ("Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation." (citation omitted)).

Sanimax finally directs us to two statements made by City officials that purportedly establish retaliatory causation. First, Sanimax asserts that the City Attorney remarked during a phone call to Sanimax's counsel that the intent of the 2019 Zoning Ordinance was to "'sunset' Sanimax and put it out of business." In his deposition, the City Attorney admitted to using the term "sunset" but contested Sanimax's characterization of the call, stating that "sunsetting" under Minnesota law is a term of art describing that a nonconforming use may continue until the property owner voluntarily ceases the use. Second, Sanimax's plant manager testified that he overheard a conversation at City Hall between the City Planner and a business owner as they were waiting for a zoning meeting to begin. The business owner expressed his concern over the 2019 Zoning Ordinance, to which the City Planner responded that the City had no intention of closing existing businesses. The business owner then quipped, "I wish you could use it to . . . get rid of those stinky neighbors next to me here," referring to Sanimax. The City Planner replied to the effect of: "[I]f there's a legal means to do so, we will."

Even when construing all reasonable inferences in favor of Sanimax, as we must on summary judgment, these two statements are insufficient to create a genuine dispute of material fact regarding retaliatory causation. We note that Sanimax's retaliation claim challenges a legislative action taken by the City Council, of which there is no indication that the City Attorney or City Planner were members. Sanimax thus bears the burden of showing that the City Council—as a collective body—acted with retaliatory intent, not individuals within the municipal bureaucracy who did not vote to enact the 2019 Zoning Ordinance. See Guth v. Tazewell Cnty., 698 F.3d 580, 586 (7th Cir. 2012) ("[I]n arguing retaliation [the plaintiff] encounters an

-15-

unsuspected obstacle: it is more difficult to prove the bad intent of a legislative body, which is a collective, than of an individual.").

With this in mind, and considering that we have found Sanimax's other evidence on this issue insufficient to create a genuine factual dispute, no reasonable jury could find that these two statements standing alone establish a causal nexus between Sanimax's protected conduct and the 2019 Zoning Ordinance. In so finding, we do not discount that the City Planner and City Attorney may have counseled, advised, or otherwise influenced the City Council regarding the 2019 Zoning Ordinance, nor do we disregard Sanimax's contention that these men harbored a retaliatory animus. But "an official's 'action colored by some degree of bad motive does not'" lessen the rigorous but-for causation standard. Nieves, 139 S. Ct. at 1722. And the extant evidence, which consists only of isolated, ambiguous statements made by non-councilmembers, is insufficient to survive summary judgment.

III.

Sanimax next claims that the 2019 Zoning Ordinance violates the Equal Protection Clause of the Fourteenth Amendment. Sanimax does not allege that it is a member of a discrete group but asserts instead that the City singled it out as a "class of one" by excluding like businesses from the I-1 Light Industrial district. The Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). As we have noted:

> Where a plaintiff has not shown discrimination based on membership in a class or group, the Supreme Court's 'cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'

-16-

Mensie v. City of Little Rock, 917 F.3d 685, 692 (8th Cir. 2019) (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam)). The "threshold inquiry," therefore, is whether the class-of-one plaintiff is "similarly situated to others who allegedly received preferential treatment." Robbins v. Becker, 794 F.3d 988, 996 (8th Cir. 2015). This presents a significant hurdle: "the persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in *all material respects*." Id. (emphasis added) (citation omitted). Absent such a showing, a class-of-one claim must fail. Id.

Regarding local zoning decisions in the Equal Protection context, this Court's task is only "to ascertain whether there has been a transgression upon the property owner's constitutional rights"; it is not to "assume the role of a 'super zoning board'" and "reverse the commission merely because a contrary result may be permissible." Mensie, 917 F.3d at 692 (citations omitted). Accordingly, the plaintiff must "provide a specific and detailed account of the nature of the preferred treatment of the favored class, especially when the state actors exercise broad discretion to balance a number of legitimate considerations." Id. (citation omitted).

Sanimax identifies Twin City Hide and Twin City Tanning as its comparators. These businesses operate south of Interstate 494 and were not included in the 2019 Zoning Ordinance's I-1 Light Industrial district. Sanimax contends that it is similarly situated to its comparators because the three businesses: engage in agricultural-industrial operations, including the rendering of animal carcasses; are located in the historic Industrial zoning district; were identified by the 2030 Comprehensive Plan as properties within the Interstate 494 corridor; were guided as Light Industrial in the 2030 Comprehensive Plan; were granted facility-expansion approvals after the City adopted the 2030 Comprehensive Plan; were included in the proposed 2017 Zoning Ordinance's I-1 district; and requested that the City exclude them from the I-1 district and continue to zone their properties as Industrial. A striking dissimilarity, however, lies in the disproportionate number of verified odor complaints attributed to Sanimax as compared to Twin City Hide and Twin City Tanning. Specifically, SEH's data reveals that between 2015 and 2021, Sanimax

generated 79 such complaints, while Twin City Hide and Twin City Tanning together generated seven—more than a tenfold difference. This led the district court to find that "[b]ecause Sanimax generates a disproportionately high number of verified odor complaints in comparison to the other two businesses, no reasonable jury could conclude that Sanimax is similarly situated to those businesses in all relevant respects." We agree.

Sanimax attacks the district court's holding on several fronts, first arguing that the quantity of odor complaints is irrelevant to the similarly situated analysis. Specifically, Sanimax argues that the district court, by relying on the quantity of odor complaints, did not precisely define its claim. See Klinger v. Dep't of Corr., 31 F.3d 727, 731 (8th Cir. 1994) ("[B]ecause the similarly situated inquiry depends on what government action the plaintiffs are challenging, we must first precisely define the plaintiffs' claim."). But this assertion ignores that the 2030 Comprehensive Plan, which envisioned the I-1 Light Industrial district, identified "foul odors" as a lingering problem in the BridgePoint Business Park and Interstate 494 corridor, stating that the City would need to "work comprehensively" to remedy the issue. Specifically, it identified "rendering, hide processing, hide tanning, [and] slaughtering/meat production" as uses that created noxious odors and affected redevelopment efforts in the area. This argument also belies the text of the 2019 Zoning Ordinance, which states that the I-1 district "is intended to regulate and map those areas identified in the comprehensive plan for uses that do not in their operation create levels of . . . odor . . . and other externalities that are offensive and detrimental to the orderly development and use of surrounding properties."

Sanimax attempts to qualify the above text by contending that the Comprehensive Plan only "considers odor issues generally, *not* any specific number of odor complaints." This assertion is a nonstarter. To address the subject matter raised in the Comprehensive Plan, the City implemented an odor complaint response program in conjunction with SEH. Under this program, the City forwarded complaints received from residents to SEH, which would investigate the source and strength of the reported odors. In other words, the City relied on numerical data to

-18-

tackle its odor problem.  It is indeed puzzling to contemplate how a local government could "generally" address bothersome odor emissions without developing a quantifiable process through which it could identify the sources of the emissions for remediation.

Sanimax also challenges the district court's reliance on Griffin Industries, Inc. v. Irvin, in which the Eleventh Circuit found that "[g]overnmental decisionmaking challenged under a 'class of one' equal protection theory must be evaluated in light of the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision."  496 F.3d 1189, 1203 (11th Cir. 2007).  Particularly, "when plaintiffs in 'class of one' cases challenge the outcome of complex, multi-factored government decisionmaking processes, similarly situated entities 'must be very similar indeed.'"  Id. at 1205 (citation omitted).  In Griffin, a poultry-rendering plant alleged that it had been singled out for disparate treatment and regulation despite being similarly situated to another poultry facility.  Id. at 1202-03.  The court dismissed this argument upon finding that the plant experienced a substantial increase in odor complaints from nearby residents stemming from its recent expansion of rendering operations, which in turn fomented intense political pressure for local officials to remedy the issue.  Id. at 1206.  By the same token, the plant failed to allege that its comparator had similarly experienced an uptick in odor complaints owing to an expansion of rendering activities or that it was also the source of political backlash.  Id.  "In evaluating whether a regulator has treated two facilities differently," the court noted, "all three points—recent substantial changes in the volume of industrial activity, high levels of citizen complaints, and pressure from local politicians—are relevant in the comparison."  Id.  Given that "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause," the court ultimately rejected the poultry plant's class-of-one claim.  Id. at 1207 (citation omitted).

While Griffin does not bind this Court, we find the Eleventh Circuit's analysis persuasive and its reasoning sound.  See Duluth, Winnipeg & Pac. Ry. Co. v. City of Orr, 529 F.3d 794, 798 (8th Cir. 2008) ("[A]lthough we are not bound by another

circuit's decision . . . a sister circuit's reasoned decision deserves great weight and precedential value." (second alteration in original) (citation omitted)). Here, as we have already discussed, the 2030 Comprehensive Plan identified odor mitigation as a priority for future development, and the 2019 Zoning Ordinance created the I-1 Light Industrial district in furtherance of this goal. Moreover, the City received an increasing number of odor complaints in recent years from residents incensed by Sanimax's stench, and local leaders faced mounting pressure from the public to address the problem. "Regulators act on the basis of available information." Griffin, 496 F.3d at 1207. It follows, then, that odor complaints are a factor that "an objectively reasonable governmental decisionmaker would have found relevant in" devising the 2019 Zoning Ordinance, which set forth the boundaries of the I-1 district. See id. at 1203.

Sanimax argues that the court in Griffin distinguished zoning-based class-of-one claims, such as those raised in Olech, 528 U.S. at 562, and Executive 100, Inc. v. Martin County, 922 F.2d 1536 (11th Cir. 1991), from the "complex, multi-factored governmental decisionmaking processes" at issue in that case. Griffin, 496 F.3d at 1205. In Olech, the plaintiff challenged a municipality's condition that she grant a 33-foot easement to allow for a connection to the local water supply where other property owners were required to grant only 15-foot easements. 528 U.S. at 563. And in Executive 100, the plaintiffs challenged a county's denial of their zoning variance request where others had been granted the same variance. 922 F.2d at 1538. The Eleventh Circuit opined that these cases represented "one-dimensional" decisions that allowed the courts to conduct their similarly situated analyses "succinctly and at a high order of abstraction." Griffin, 496 F.3d at 1203, 1210. Here, by contrast, Sanimax challenges the creation of a new zoning district spanning 115 parcels that was envisioned more than fifteen years ago in the 2030 Comprehensive Plan. The myriad City Council work-session reports, draft ordinances, and other planning documents that were produced in subsequent years—in which the City revised existing zoning and architectural provisions and developed new permitted uses, conditional uses, and prohibited uses, as well as criteria for conditional use and interim use permits, all with the input of the City

-20-

Zoning Commission, planning staff, and the public—show that the 2019 Zoning Ordinance was a far cry from the "one-dimensional" zoning decisions at issue in Olech and Executive 100.

Sanimax alternatively argues that, even if the disparity in the volume of odor complaints is a relevant consideration in the similarly situated inquiry, numerous pieces of evidence in the record undermine the legitimacy of the complaints attributed to its facility. However, we have previously addressed much of the same evidence when analyzing Sanimax's retaliation claim challenging the 2019 Zoning Ordinance, including the many emails exchanged between City employees and SEH consultants and the City's reasoning for excluding properties south of Interstate 494 from the I-1 Light Industrial district. Sanimax seemingly cites this evidence again to assert that the City's retaliatory animus undercuts the reliability of the odor complaint data. This contention would certainly hold water if we did not reject Sanimax's characterization of the record once before. But given that the evidence does not support a claim that the City retaliated against Sanimax for engaging in protected conduct, we similarly find that the cited evidence fails to support a claim that the odor complaints lodged with the City are illegitimate on this basis. With that in mind, we consider the other points that Sanimax advances regarding the validity of the odor complaints.

First, Sanimax points to the report prepared by its toxicology and industrial hygiene expert finding that between May 3 and May 7, 2021, Twin City Hide and Twin City Tanning produced stronger odors than Sanimax. Recall, however, that the City instituted an odor complaint response program to address fugitive odor emissions. It was chiefly concerned, then, with responding to the problem properties identified by its residents. And as shown by the complaint-based data, residents were perturbed to a greater degree by its odors than they were by those emitted from Twin City Hide and Twin City Tanning, which is valid given that these two businesses were located one mile south of Sanimax's facility on the other side of Interstate 494. The finding of Sanimax's expert does not cast doubt on the reliability of the odor complaints.

-21-

Second, Sanimax asserts that the 2019 Zoning Ordinance, which designated its facility as a nonconforming use, will only perpetuate—and may in fact exacerbate—the City's odor problem, as Minnesota law allows for the continuance of nonconforming uses. See Minn. Stat. 462.357, subdiv. 1e. We strain to see how the legislative protection afforded to nonconforming uses delegitimizes in any way the volume of odor complaints attributed to Sanimax. To the extent that Sanimax questions the City's reliance on complaint-based data in addition to the text of the 2030 Comprehensive Plan when selecting the boundaries of the I-1 Light Industrial district, "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." Beach Commc'ns, Inc., 508 U.S. at 313. This is particularly true where a legislature must engage in line-drawing. Id. at 315.

Third, Sanimax posits that the City permitted SEH to erroneously assign odor complaints to its facility despite being aware that neighboring businesses were instead likely responsible for the odor emissions. This argument refers to an email exchange between the City Planner and an SEH consultant regarding three complaints in which residents reported odors consisting of dog food and chemicals. The City Planner informed SEH that two "high-end dog food" factories operated near Sanimax's property, and that SEH should take care to segregate complaints describing dog food odors from those relating to Sanimax. In response, the SEH consultant stated that she "wasn't aware of this previously." Of course, a wrongful attribution of odor complaints to Sanimax would undermine the validity of its odor complaint record. But as the City emphasizes, none of the three complaints that precipitated the email resulted in verified odor complaints, nor does the record elsewhere indicate or allow us to reasonably infer that the City erroneously verified that odor emissions from neighboring dog-food factories emanated from Sanimax at any point. Without evidence to flesh out Sanimax's contention, we are left only with a bare allegation insufficient to raise a genuine issue for trial. See Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005) ("A plaintiff . . . must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.").

-22-

Fourth, Sanimax contends that many odor complaints originated from officials at City Hall. Sanimax seems to insinuate that City officials filed bogus odor complaints to artificially inflate the disparity between its property and other odor emitters, which the City then relied on to discriminate against Sanimax with the 2019 Zoning Ordinance. But this assertion glosses over the fact that it is the volume of *verified* odor complaints, i.e., those in which the City Engineer confirmed that the property was the source of the emission that precipitated the complaint, and that the strength of the odor was at least seven odor units, which distinguishes Sanimax from its comparators, rather than the volume of resident-submitted complaints. Put differently, even if we accept Sanimax's argument that City officials had submitted unsubstantiated odor complaints, there is no evidence showing that those complaints survived SEH's verification procedures, or that such processes were illegitimate, in the sense that SEH erroneously confirmed Sanimax as the source of the odor despite receiving a purportedly fictitious complaint. Given that the similarly situated analysis turns on the tenfold disparity in verified odor complaints between Sanimax and its comparators, the odor complaints to which Sanimax refers do not alter the outcome. In any event, the record does not support an inference that City officials had lodged unsubstantiated complaints, and Sanimax likewise cites no authority establishing that the officials' actions in reporting the presence of foul odors at City Hall was legally improper or should be discounted in a class-of-one analysis.

Fifth, Sanimax claims that the City "predetermined" that its facility was the source of all odor complaints because it forwarded every complaint it received to Sanimax, regardless of its origin. The record reveals that this was done at the request of Sanimax's environmental specialist, who would independently investigate the raw complaint data to determine whether Sanimax's facility was the source of any of the complaints. In other words, Sanimax attempts to create a fact issue by obfuscating its own actions. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

-23-

As Sanimax fails to meet the "high burden of proof" attendant to a class-of-one claim, the district court did not misapply the summary judgment standard or improperly weigh the volume of verified odor complaints against the other similarities between Sanimax, Twin City Hide, and Twin City Tanning. Nolan v. Thompson, 521 F.3d 983, 990 (8th Cir. 2008). In raising these arguments, Sanimax misapprehends the operative inquiry in a class-of-one claim: it matters not that the similarities between the three businesses abound; rather, Sanimax must show that it is virtually identical to its comparators in all material respects. See Robbins, 794 F.3d at 996. And while Sanimax is correct that this Court has often resolved similarly situated analyses at the summary judgment stage in cases where we could not meaningfully assess a party's comparators, see, e.g., id. at 996; Mensie, 917 F.3d at 692, we have never held that a voluminous factual record—or lack thereof—is itself determinative of whether summary judgment is proper. Indeed, the robustness of the record here is precisely what defeats Sanimax's class-of-one claim, because it shows that the property is in a class of its own as it relates to the emission of vexing odors. As we have recognized in other contexts, even the most fact-intensive disputes "are not immune from summary judgment." Pye v. Nu Aire, Inc., 641 F.3d 1011, 1018-20 (8th Cir. 2011) (citation omitted) (affirming summary judgment on a Title VII claim after conducting a similarly situated inquiry). Accordingly, Sanimax's class-of-one claim fails.

IV.

Sanimax finally challenges the 2020 Odor Ordinance as unconstitutionally vague both facially and as applied to the circumstances of this case. However, "[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand" and "judged on an as-applied basis." Gallagher v. City of Clayton, 699 F.3d 1013, 1021 (8th Cir. 2012) (citations omitted). The First Amendment does not protect the

emission of foul odors; we therefore only consider Sanimax's as-applied vagueness challenge.[4]

The void-for-vagueness doctrine, which is embodied in the Fifth and Fourteenth Amendments, Postscript Enters., Inc. v. Whaley, 658 F.2d 1249, 1254 (8th Cir. 1981), "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way," FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012). "To defeat a vagueness challenge, a penal[5] statute must pass a two-part test: The statute must first provide adequate notice of the proscribed conduct, and second, not lend itself to arbitrary enforcement." United States v. Barraza, 576 F.3d 798, 806 (8th Cir. 2009) (citation omitted). We are mindful, of course, that the Due Process Clause does not require "perfect clarity and precise guidance." Hegwood v. City of Eau Claire, 676 F.3d 600, 603 (7th Cir. 2012) (citation omitted). Moreover, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." Nygard v. City of Orono, 39 F.4th 514, 519 (8th Cir. 2022) (quoting Parker v. Levy, 417 U.S. 733, 756 (1974)).

---

[4]Sanimax relies on Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc. to argue that it may mount a facial challenge against the 2020 Odor Ordinance even though the Ordinance does not regulate constitutionally protected conduct. 455 U.S. 489, 497 (1982) ("A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process."). Our subsequent case law has not extrapolated Hoffman Estates to support Sanimax's proposition. E.g., Woodis v. Westark Cmty. Coll., 160 F.3d 435, 438-39 (8th Cir. 1998) (noting in its discussion of Hoffman Estates that "vagueness challenges that do not involve the First Amendment must be examined in light of the specific facts of the case at hand and not with regard to the statute's facial validity" (citation omitted)).

[5]A violation of the City Code is classified as a misdemeanor. South St. Paul, Minn. Code § 38-103.

A.

We first consider whether the 2020 Odor Ordinance provided Sanimax with adequate notice of the proscribed conduct. Sanimax asserts that the underlying odor prohibition in § 110-142 of the City Code, as incorporated in the 2020 Odor Ordinance, is "patent[ly] vague[]" because it deems unlawful the emission of "odors or smells which are offensive or obnoxious to another person within the City" without providing explicit standards by which a violation will be determined. "Legislatures are not required to define every term in a statute." Adam & Eve Jonesboro, LLC v. Perrin, 933 F.3d 951, 958 (8th Cir. 2019). "In the absence of a definition, words are given their ordinary meaning." Id.

Here, § 110-141 defines "odor" as "that which produces a response of the human sense of smell to an odorous substance." See Nygard, 39 F.4th at 519-20 (noting that terms may be defined elsewhere in a city code). Moreover, "offensive" and "obnoxious," while undefined, are "terms that are 'widely used and well understood,'" Langford v. City of St. Louis, 3 F.4th 1054, 1059 (8th Cir. 2021) (quoting Cameron v. Johnson, 390 U.S. 611, 616 (1968) (finding that terms in a traffic ordinance such as "obstruct, impede," and "interfere" provided adequate notice because citizens would "have little difficulty understanding" such terms), and track the meaning of "nuisance" as that term is defined in the City Code and under Minnesota law, see South St. Paul, Minn., Code § 34-19 ("Public nuisance or nuisance means a condition on property that unreasonably annoys . . . the public health or safety and is a public health or safety hazard, including . . . any location . . . which emits unpleasant or noxious odors."); Minn Stat. § 561.01 ("Anything which is . . . indecent or offensive to the senses . . . so as to interfere with the comfortable enjoyment of life or property, is a nuisance."). Sanimax recognized as much in its complaint when it characterized § 110-142's odor prohibition as a "nuisance ordinance." And the remaining subsections in § 110-142, which prohibit odor emissions that "[c]reate a detrimental effect on the property of another person in the City" or '[u]nreasonably interfere with the enjoyment of life, health, safety,

-26-

peace, comfort or property of another person in the City," further confirm our conclusion.

In this vein, the similarity of the challenged language to that used in traditional nuisance statutes is sufficient to put Sanimax on notice of what is prohibited. Cf. Jake's, Ltd., Inc. v. City of Coates, 284 F.3d 884, 890 (8th Cir. 2002) (rejecting an argument that an ordinance conferred unbridled discretion by authorizing the revocation of a license if the licensee was "a menace to the health, safety, or general welfare of the community" because the ordinance's language resembled the definition of a public nuisance "long known to the law"); ChemSol, LLC v. City of Sibley, 386 F. Supp. 3d 1000, 1019 (W.D. Iowa 2019) (rejecting a facial vagueness challenge to an odor ordinance that prohibited the creation of "noxious exhalations, offensive smells or other annoyances" where that language tracked a state statute's definition of a public nuisance); see also Restatement (Second) of Torts § 821B cmt. b (noting that public nuisances at common law "included interference . . . with the public comfort, as in the case of widely disseminated bad odors, dust and smoke"). "This is not the case," then, "of 'wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.'" Metro. Omaha Prop. Owners Ass'n v. City of Omaha, 991 F.3d 880, 887 (8th Cir. 2021) (citation omitted).

Furthermore, Sanimax received a warning letter stating that the City had received "a number of complaints regarding offensive odors being emitted" by its facility, in violation of § 110-142, that were verified by SEH using a Nasal Ranger olfactometer. The letter further instructed that compliance with § 110-142 required Sanimax to "cease[] and desist[] from emitting offensive odors, specifically, odors that are detectable at a level of 7 odor units or higher, as measured from a location not on the Sanimax property." Accompanying the letter was an email from the City to numerous Sanimax representatives stating that the enclosed letter was intended to provide "instructions regarding what is needed to bring the property into compliance to avoid administrative citations." These extra-statutory communications were also sufficient to provide Sanimax "fair warning" that it was emitting odors in violation

of the City Code.  See Nygard, 39 F.4th at 520 (rejecting a vagueness challenge to a zoning ordinance where a city inspector informed the appellant that a construction permit was required under the ordinance).

Sanimax counters this finding by emphasizing language in the warning letter stating that "[a] Nasal Ranger measurement is not necessary to establish that an odor is offensive, detrimental to other properties, or unreasonably interferes with [the] peace, comfort and enjoyment of another's property."  But the three complaints that precipitated the transmission of the warning letter, along with each of the 20 administrative citations that the City thereafter issued to Sanimax, were all verified by SEH using a Nasal Ranger, which returned readings of at least seven odor units for each complaint.  The void-for-vagueness doctrine "does not permit a plaintiff to 'speculat[e] about possible vagueness in hypothetical situations not before the Court.'"  Adam & Eve, 933 F.3d at 959 (alteration in original) (quoting Hill v. Colorado, 530 U.S. 703, 733 (2000)).  Accordingly, we are unpersuaded by Sanimax's conjectural assertion regarding actions that the City may take in the future.

B.

We next consider whether the 2020 Odor Ordinance lends itself to arbitrary enforcement.  Sanimax contends that it does, as evidenced by the fact that the City issued three administrative citations without adhering to the verification procedures outlined in its warning and citation letters.  On these occasions, SEH investigated odor complaints by conducting field observations in the vicinity of the locations provided in the complaints.  The odor complaint response reports reveal that, due to the generalized descriptions provided by residents in the complaints and unfavorable wind conditions, field inspectors were unable to identify the sources of the odors. SEH then expanded its investigation in each of these instances by conducting monitoring upwind and downwind of five properties identified as historic odor generators in a previous study, which included Sanimax, Twin City Hide, and Twin City Tanning.  SEH's additional observations returned Nasal Ranger readings of at

-28-

least seven odor units at Sanimax's facility, leading to the issuance of citations pursuant to the three separate findings.

Sanimax argues that the City issued these citations without confirming the "source of the odor emission that precipitated the complaint" using a Nasal Ranger, as SEH was unable to verify that Sanimax was the source of the odor complaints. See South St. Paul, Minn. Code § 110-141 (defining "verified odor complaint"). We fail to see how the City's actions create an enforcement scheme "so standardless that it authorizes or encourages seriously discriminatory enforcement." Adam & Eve, 933 F.3d at 958 (quoting Fox Television, 567 U.S. at 253)). Perhaps the result would be different if SEH conducted additional monitoring only at Sanimax's facility, but the record shows that SEH investigated five different properties that it had previously identified as odor emitters and took objective measurements using a Nasal Ranger near each site. SEH promulgated standard operating procedures in 2017, which were intended "to provide a methodical approach to responding to the odor complaints." This guidance describes precisely the events on which Sanimax premises its argument:

> If an odor is not detected at or near the odor complaint location, SEH will conduct odor monitoring upwind and downwind of each of the five potential odor generators. An odor source is identified as the odor generator if odor monitoring downwind of the potential source is greater than the odor strength upwind of the potential source.

Such directives "provide 'explicit standards' for [the City to] apply the law in order to prevent arbitrary or discriminatory enforcement." Thorburn v. Austin, 231 F.3d 1114, 1120 (8th Cir. 2000) (citation omitted). Furthermore, SEH apprised Sanimax of its standard operating procedures in a 2017 meeting with the City, which Sanimax's environmental specialist relayed to other employees in a subsequent email explaining that SEH would "check all odor points upwind or downwind of all facilities . . . identified by the comprehensive odor study" if it was unable to detect odors at the location provided in a complaint. The 2020 Odor Ordinance along with the accompanying guidance and letters are thus "sufficiently clear that the

speculative danger of arbitrary enforcement does not render" the Ordinance impermissibly vague. United States v. Birbragher, 603 F.3d 478, 489 (8th Cir. 2010). Sanimax attempts to establish a history of arbitrary enforcement by asserting that the City has cited only its property for noncompliance and no other odor emitters. The City has in fact issued a warning letter to Twin City Hide and Twin City Tanning for emitting offensive odors; that the City has not had occasion to issue an administrative citation demonstrates that these businesses have complied with the odor prohibition enumerated in § 110-142, as evidenced by the absence in the record of any subsequent verified odor complaints.

Sanimax also contends that the 2020 Odor Ordinance's two-track enforcement mechanism is devoid of an objective standard by which the City will place an odor emitter on the "friendly" Track One, which requires a property labeled as a Significant Odor Generator to develop an odor management plan in collaboration with the City, or the "more punitive" Track Two, which empowers the City to employ the administrative citation process used for code enforcement actions. City Council planning documents state that the decision is "solely at the City's discretion," which will "decide whether the business is making a good faith effort to collaborate" or instead "decline[s] to work with the City."

The discretion afforded to the City in this context is not in itself fatal to the 2020 Odor Ordinance, as the "enforcement of all laws involves some discretion." Thorburn, 231 F.3d at 1121. Importantly here, the Ordinance "plainly demarcate[s] the range of penalties that [the City] may seek and impose." United States v. Batchelder, 442 U.S. 114, 126 (1979). In Batchelder, the Supreme Court rejected a vagueness challenge to two criminal statutes that proscribed identical conduct but affixed disparate penalties to each offense, noting that the provisions "unambiguously specify the activity proscribed and the penalties available upon conviction." Id. at 123. "Although the statutes create uncertainty as to which crime may be charged and therefore what penalties may be imposed," the Court found, "they do so to no greater extent than would a single statute authorizing various alternative punishments." Id.

-30-

The 2020 Odor Ordinance is, in essence, a single statute authorizing various alternative punishments. Put differently, both tracks of enforcement operate as potential remedies for a violation of the underlying odor prohibition in § 110-142, a provision which we found above was sufficient to provide Sanimax with "fair warning of the criminality of [its] own conduct." Nygard, 39 F.4th at 519 (citation omitted). This, together with the Ordinance's specification of the potential penalties that are applicable to a property that violates § 110-142, satisfies the requirements of due process. See Batchelder, 442 U.S. at 123. The City Code also provides an appeal procedure for businesses classified as Significant Odor Generators under Track One and for those administratively cited under Track Two, see South St. Paul, Minn. Code §§ 110-145, 38-107, which we have previously found counsels against a finding of arbitrary enforcement, Metro. Omaha, 991 F.3d at 887 (noting that an ordinance appeal procedure "acts as a check on wrongful decisions or orders"). In sum, Sanimax's void-for-vagueness claim fails.

V.

For the foregoing reasons, we affirm the judgment of the district court.

_____

-31-